This appeal is from a judgment of the district court awarding compensation to the plaintiff. She is the widow of one W.F. *Page 201 
Dehn whose employer had duly complied with the provisions of the Compensation Law.
The workmen's compensation bureau defended on the ground that the claimant's husband did not contract the disease from which he died in the course of his employment. It here insists that the evidence on this point does not support the findings of the trial court; that the employee died from a certain disease; and that his death was not in any legal sense the proximate result of any condition of the employment. Stated in somewhat different terms, the bureau contends that the undisputed testimony shows that the deceased died from encephalitis-lethargic, or sleeping sickness; that sleeping sickness is a germ disease; that medical science has not, so far, succeeded in isolating this germ; that while it is the prevailing opinion in medicine that the infection enters the brain through the blood stream, the manner in which the germ obtains lodgment in the body, the conditions under which it thrives outside the human body, the period of incubation, and the like, are entirely unknown and are wholly within the realm of pure speculation. From this premise the conclusion is drawn that the finding of the trial court to the effect that death was the "proximate result of the condition" of the employment is, speculation and without substantial foundation in the evidence; that the testimony affirmatively discloses that any conclusion with respect to the origin of the germ which brought on the fatal disease would be a mere guess.
William F. Dehn died April 20, 1923, after an illness of about three days. For many days prior to his death he had been in the employ of a firm of contractors which had duly complied with the Compensation Law. The deceased was a carpenter. He had been engaged in doing some work in connection with the remodeling of a hotel in Fargo and a cafe maintained in connection therewith. The cafe is described in the testimony as the Blue Bird Cafe. It appears that he had also been working on two other and different buildings in the City of Fargo. To all appearances, he was in good health up to April 16, when he complained that his head felt "stuffed;" on the night of the 17th, he complained of being tired, and on the 18th, was unable to go to work. In the forenoon of the 18th, a physician, Dr. Haugen was called, and found the decedent in a semi-comatose condition, whereupon the patient was removed to a hospital, and treatments administered. The medical *Page 202 
treatments were wholly ineffectual and the patient died on the evening of the 20th, the third day after the physician was called. Two physicians testified, and they agree that he died of a form of encephalitis of the lethargic type, commonly known as sleeping sickness.
The testimony of the medical witnesses is to the effect that this disease is an infection of the brain brought on by a germ which reaches the brain tissue through the blood stream. There is no evidence that any person afflicted with this disease had been on any premises at or near which the decedent worked, or that he had, as far as known, been in any manner directly or indirectly exposed to the infection.
The doctors agree that the disease from which the claimant's husband died was sleeping sickness of a certain type. Dr. Haugen testified for the plaintiff and it is largely upon his testimony that the plaintiff relies. Omitting preliminaries, the testimony of this witness with respect to the circumstances of the employee's death, the disease and its nature, may be summarized as follows: "In the forenoon of April 18, 1924, I was called to the bed-side of William F. Dehn. The only subjective symptoms, solicited by questioning, were a dull headache; a stiffness or spastic condition of the muscles; a temperature of 103; slow pulse, about 100, shallow breathing and slight cyanosis. The patient was in a semicomatose condition. I then diagnosed his condition as a cerebral infection of unknown bacteria, the bacteria not having been isolated by the medical profession. I can not, therefore, say specifically to what the infection was due. A cerebral infection is not always due to the same cause; infection results from the infusion of bacteria into the brain tissue. Most of the cerebral infections are due to bacteria, to our knowledge. There are various infections caused by known bacilli or original pus germs, and then there are supposed infections caused by unknown bacilli.
Q. Well now, how do you classify the disease that Mr. Dehn had?
A. Tentative diagnosis in my estimation was classified as acute cerebral infection by unknown bacillus.
Q. It is then one of those infections that medical science knows little about, is that it?
A. I believe it would be. *Page 203 
As to the channels through which the various infections may occur, the doctor testified: "Infections could enter the body through inoculations, by foods directly, by inoculations, by needles or instruments, through the air passages and the digestive tract. This is true of infections in general. The particular infection from which Dehn suffered, I hardly think would be obtained in any other or different way. I found no abrasions on the skin. It results that the patient might have been infected, therefore, either through the air passages, or through some food." An extended hypothetical question was then put to the witness in which the conditions assumed to have existed in the employment were set out in some detail, such as the fact that the patient had been in good health, except for an attack of the flu some years before, that he had been working about and tearing down old buildings, where there were accumulations of dirt and debris, filth and dust of all sorts, insect powder and evidence that the place had been infested with rats; that during the period of employment and some days before he became ill, the air he breathed was laden with dust; that no abrasion appeared on the skin, and that the defendant lived at home with his family, and took all his meals there, that no similar or like sickness had developed in the family. The witness was then asked: "What in your opinion, as a physician, would have been the cause of that infection in that particular case?" The doctor answered, "My suspicion would be that the infection was carried by the dust inhaled. I mean that would be my judgment."
Under cross-examination, Dr. Haugen further testified that there were "present in every human body, germs which, if present in sufficient quantities, will cause diseases, such as pneumonia, scarlet fever, and many others; that the deceased had all the outward symptoms of encephalitis lethargic; that that disease is a germ disease; that it is an infection of a part of the brain by bacteria; that the germ has not been isolated; that medical science is unable to say from what source or condition the germ may have been acquired by any person suffering from the disease; that there is no more reason to believe that the encephalitis germ is present in dust, dirt or filth, than in city water or in fruit or other forms of food; the germ may be of the class transmitted from one human being to another; and while it is my suspicion or opinion from the history of the case, that the deceased became infected *Page 204 
by reason of the conditions in the place where he worked, neither I nor any doctor can state that as a positive fact; and I could not say from my observations that there is an absolute causal connection between the disease that caused death and anything that occurred in the course of his employment. The period of incubation of that germ is unknown; whether the period of incubation be a day, a week or a month, we do not know. Q. So that, by that, Doctor, you must necessarily deal entirely in the field of speculation in determining where the deceased acquired the germs and the resultant disease which caused his death? A. Yes, sir."
On redirect-examination, Dr. Haugen again testified: "Where there is a general condition of filth and dirt, there one is more likely to find disease; and where there is a condition of cleanliness, one usually finds an absence of those bacteria causing disease." On recross-examination, counsel for the bureau asked the witness the following question: "Q. There is no presumption that a germ, because it is a germ, necessarily means an inhabitant in the conditions that were found and testified to in this history, it being an unknown germ, that is no necessary presumption that because there is a condition in that history under which certain known germs are usual then that also an unknown germ may come from the same source?" A. "It is merely a suspicion. The question as asked cannot be answered, I can't answer it. I don't know where this germ inhabits." No further testimony was given by this witness, and no further medical testimony was given by any witness called by plaintiff.
Dr. Nichol was called by the defendant, and his testimony, with reference to the condition of the deceased and the disease from which he died, was substantially as follows, omitting the preliminaries: "On April 19, 1924, I was called to the home of William F. Dehn. I found him unconscious, showing inflammation of the central nervous system with gross changes in the reflexes, indicating cerebral inflammation. From the physical manifestations and the examination I made and the symptoms discovered, I concluded that the brain stem or hub was infected. That is, at the base of the brain. That part of the brain might be infected by germs through inhaling or through the air passages. I concluded that the patient was suffering from encephalitis-lethargic. The present theory of the medical profession is that the disease is *Page 205 
probably contracted by personal contact. I know of no case where that disease has been contracted through dust or odors. Where infection enters through the nasal passages, the most common disease of the brain is meningitis; encephalitis of the lethargic type and meningitis are very well known and entirely distinct diseases. I treated the patient until he died, on the following morning, the 20th. I saw him approximately five or six times, and gave him treatments, but without beneficial results. As I watched the progress of the malady, it confirmed the original diagnosis. This type of sleeping sickness, as it is commonly called, is an infectious disease, but how contagious it is, no one knows. It occurs epidemically. I know of no germ disease contracted by breathing air contaminated with odors. Odors are indicative of decomposition of organic matter, but not necessarily of the presence of pathologic organisms, that is, of organisms which cause disease." Counsel then put to the witness a hypothetical question containing substantially the same assumed facts, with respect to the conditions of the employment, as were stated in the question put to Dr. Haugen, ending with the following: "Would you state from these facts that there would be any causal connection between the employment, such as I have described, and the disease which the patient had?" To which the witness answered: "I would not think so."
On cross-examination, Dr. Nichol testified that it was possible and quite likely that some infections be contracted by breathing in particles of dust and therefore breathing germs into the lungs; but with respect to sleeping sickness, he did not believe it is so done. Reduced to narrative form his testimony is: "The particular infection in question is possibly and probably obtained through the blood channels and this has been established as a scientific and accepted fact. It is only through the blood stream that the infection enters the brain. An infection in the lungs might be carried by the blood stream into the brain, and often is; an infection may be started in the lungs or in some other part of the body and be carried by the blood stream to the brain, resulting in an infection of that organ. Infection of the type here under consideration, might occur in that way. Medical science, with respect to this disease, has concluded from pathological findings, post-mortems, and characteristic pathology of the disease that it is essentially an infection, which starts from the blood vessels in the brain. Science has not definitely *Page 206 
discovered the host of the bacteria; but due to considerable experimental work, it has been concluded that the host has certain characteristics. The bacillus of the disease might host upon the tissues of the lungs and be carried thence by the blood stream to the brain. I would not say that the infection could not take place in that manner. As I stated before, I do not believe that the dust and impurities in the atmosphere were a factor. It may develop, as scientific investigation pushes back the boundaries of knowledge that dust and impurities could have something to do with the disease, but in my opinion at the present time, it has nothing to do with it."
On redirect-examination, the witness testified further that he found symptoms of haematogenous infection; "that it came on suddenly; experimental work indicates that the germ has been isolated and the disease reproduced from it, but we have never been able to grow an organism. We know some of the characteristics of the germ. It is very small, probably. It is not correct to say that it is merely conjecture that the germ is transmitted by infection. The nature of the germ has been determined, although it has not yet been entirely accepted. Medical science knows a tremendous lot about the disease. The only thing that remains is to satisfactorily identify the organism. The disease may result from injury and is frequently associated with influenzal infections. While the disease might follow injury through the nasal passages, by direct contact is the more likely method, that is, by the contact of a person with another who carries the germ."
At the close of the case, the Bureau's definition of the term "injury," as "used in the many cases before it," was put into the record as follows:
"An injury as a rule must be a trauma or of traumatic origin. A sudden unexpected violent occurrence which can be definitely located and determined as to time and place, and which causes physical disability."
In Pace v. North Dakota Workmen's Comp. Bureau, 51 N.D. 815, 201 N.W. 350, this court said: "The burden of showing that the injury which resulted in death was received in the course of the employment is upon the claimant, and an award should not be made upon mere surmise and conjecture." In Gotchy v. North Dakota Workmen's Comp. Bureau, 49 N.D. 915, 194 N.W. 667, we held that a proceeding *Page 207 
like the one at bar was not properly triable to a jury, or de novo in this court; and that the findings of the trial court are presumed to be correct unless clearly opposed to the preponderance of the evidence. Having in mind the burden of proof, which the claimant must discharge, and the presumption of correctness, with which the findings are clothed, we must examine the evidence and determine therefrom whether the conclusion of the trial court, that the injury was received in the course of the employment, is so clearly opposed to the preponderance of the evidence as to require a reversal and a dismissal of the action.
The testimony indicates that when the deceased was working in the Blue Bird Cafe, the condition found was what it "usually is when you come to take out old woodwork in a hotel or restaurant," as stated by a contractor who testified for the plaintiff. This witness noticed that much insect powder had been used, and that mice and rats had visited the place. The premises were dusty, so much so, as some of the witnesses say, that it was difficult to distinguish faces or features except at close range. In general, however, the testimony does not disclose any other peculiar or unusual conditions.
We have set forth all the medical testimony and summarized the evidence which, it is claimed, has any tendency to show that death resulted from an injury received in the course of the employment. No extended comment upon it is necessary. We do not think that the testimony, or any logical and fair inferences which may be drawn therefrom, show with the reasonable probability which the law demands that the form of encephalitis from which William F. Dehn died was contracted in the course of his employment. No reasonable mind can peruse the evidence in this case and come to any other conclusion than that the facts on which the right to compensation is based afford an equally logical basis for denying as for granting the claim. Indeed, certain aspects of the medical testimony persuasively suggest that the speculative probabilities preponderate against rather than in favor of the right. Encephalitis of the lethargic type is a germ disease; it develops from a living organism which, in some manner, reaches and finds lodgment in the brain. From our knowledge of certain germ diseases, the deduction is plausible — is at least justified as a working hypothesis — that the germ of sleeping sickness lives and is transmitted *Page 208 
in a manner similar and under conditions somewhat analogous to those which characterize the spread of germ disorders.
In 1921 the Association for Research in Nervous and Mental Diseases published a monograph entitled Acute Epidemic Encephalitis (Lethargic Encephalitis). In this brochure are published the results of the investigation by the Association, with conclusions upon various aspects of the problem by the Commission under whose direction the pamphlet is published. At the conclusion of the chapter "General and Historical Considerations, Incidence, Etiology and Pathogenesis," the commission says:
"The commission is of the opinion that final conclusions as to etiology, pathogenesis and incidence are not warranted at this stage of our knowledge of lethargic encephalitis. . . .
"It is well understood that at this stage of our knowledge the life history of the disease is not fully known. We know it as yet chiefly in cross section. The characteristics of the causative organism are not fully established; the mode of conveyance cannot, therefore, be determined. Neither is the clinical course entirely appreciated in all respects. Further knowledge of the disease from all these standpoints is necessary before a final description and definition of it is warranted. It is one of those conditions, like syphilis, of which a life history is necessary before it is fully understood."
It thus appears that the specialists of this association are in unanimous accord with the undisputed medical testimony in the case at bar — opinions as to the characteristics of the germ and the mode of conveyance would be mere speculation. Again, on the subject of Diagnosis, Course and Prognosis," the Commission concludes, "Not knowing the causative factors involved in the pathogenesis of epidemic encephalitis, it becomes impossible at present to outline a rational therapy." (p. 157.)
While no conclusions are announced by the commission on the point, the following question was asked, to which the appended answer was given:
"Dr. Taylor: Are there any statistics available regarding distribution as to social position, — that people living insalubrious surroundings are less liable?"
"Dr. Wynne: Apparently not. There are no definite statistics along those lines, but judgment from distribution by nationalities and occupations *Page 209 
in the city, there seems to be little difference." (Emphasis is ours.)
Numerous cases are cited by the claimant, and it is suggested that recovery was allowed therein under circumstances not more clearly establishing that the injury for which compensation was sought arose in the course of the employment. We have examined these authorities and find that the decisions turned upon different facts of controlling importance. In McCauley v. Imperial Woolen Co. 261 Pa. 312, 104 A. 617, 17 N.C.C.A. 864, the widow claimed compensation for the death of her husband. He died of external anthrax. He had been a "wool sorter." The professional and expert testimony was unequivocally and expressly to the effect that the disease from which McCauley died, resulted from an abrasion on the neck, through which the germs of anthrax entered his body. One of the doctors testified that in all probability, "the disease was caused by the anthrax germ entering through the skin by reason of a `sticker' from the wool which deceased handled during the day." In this case the nature and origin of the infection was established by circumstantial evidence taking the case clearly out of the realm of speculation. In Chicago Rawhide Mfg. Co. v. Industrial Commission, 291 Ill. 616, 126 N.E. 616, the court held that "this evidence is scarcely susceptible of any explanation except the acquiring of the anthrax bacillus from the hides in plaintiff in error's tannery." As in the preceding cases the circumstantial evidence pointed clearly and unmistakably to that conclusion. In Carroll v. Industrial Commission, 69 Colo. 473, 19 A.L.R. 107, 195 P. 1097, the court said: "The evidence shows that the strenuous work of pitching alfalfa hay in an enclosed building combined with breathing dust-laden air, brought on an attack of heart trouble, causing instant death, and that, if Joseph Carroll, had been doing his work in the open air, the work would not have brought on a heart attack." The facts clearly point to the conclusion that the conditions under which the decedent worked accelerated a pre-existing heart trouble of an organic character resulting in death. In Rist v. Larkin, 171 App. Div. 71, 156 N.Y. Supp. 875, the claimant leaped into water to avoid impending personal injury and it was held that tuberculosis, contracted as a result of becoming wet and cold from which pleurisy and pulmonary tuberculosis developed, was an accidental injury in the course of the employment, *Page 210 
within the New York law. It would seem to require no discussion to show that the situation presented in the case at bar, is fundamentally dissimilar. In Larke v. John Hancock Mut. L. Ins. Co. 90 Conn. 303, L.R.A. 1916E, 584, 97 A. 320, 12 N.C.C.A. 308, it was held that an injury consisting of a frost bitten nose which resulted in a lesion of the skin and tissues through which erysipelas developed, resulting in death, arose in the course of the servant's employment when it occurred within the period of his employment, at the place where he may reasonably be and while he is reasonably following the duties of his employment, or in doing something incidental to it. The cases are not parallel in any legal sense. In Santa Anna Sugar Co. v. Industrial Acci. Commission, 35 Cal.App. 652, 170 P. 630, compensation was claimed for sarcoma on the left clavicle, which claimant contended resulted from a fall. The court found that there was evidence from which the commission could find that the cancer developed as a result of the injury. A physician testified that he noticed no lump or swelling the day after the fall; the lump, particularly indicating the development of the sarcoma, appeared sometime later. Clearly the findings of the commission were supported by substantial testimony.
Cases are referred to where prostration from heat, frost bites, etc., have been considered as injuries within the compensation acts. In each instance, however, there was evidence on which reasonable minds might base the conclusion that the injuries arose in the course of the employment.
We have found no case in the books similar to the one at bar. We believe it stands alone. The witness who testified as an expert in behalf of the defendant frankly admitted that one "must necessarily deal entirely in the field of speculation in determining where the deceased acquired the germs and the resultant disease which caused his death." On elementary principles awarding of compensation can not be made in such a situation. The fund administered by the compensation bureau is collected from employers of labor and is to be husbanded by it in the manner directed by the legislature for the benefit of workmen who receive injury in the course of their employment. It is not a general social insurance law justifying awards in cases of ordinary disease not arising in the course of the employment. It may be that such legislation should be enacted; but it has not been done. We are constrained *Page 211 
to the conclusion that there is no evidence upon which a finding can be based that the disease from which the husband of the claimant died was contracted in the course of his employment. Consequently there can be no recovery.
The judgment of the trial court is reversed, and the action must be dismissed. It is so ordered.
CHRISTIANSON, Ch. J., and BURKE, BIRDZELL, and NUESSLE, JJ., concur.