## SHAW'S CASE.

Cumberland.     Opinion February 9, 1928.

*Statements contained in medical writings are not competent evidence of the facts stated:*

*While the Appellate Court will not review findings of fact by the Industrial Accident Commissioner or his deputy, it is not bound by their reasoning.*

*Where an order of the Commissioner or his deputy is based in any part on statements or writings not offered in evidence, or on conjecture, it constitutes an error of law from which an appeal from the decree of the Court below based thereon will be sustained.*

While on a petition to determine present incapacity the burden is on the petitioner to show that the employee's incapacity has ceased, or, if any exists, is not due to the injury, if the deputy commissioner in dismissing the petition bases findings of fact on evidence outside the record or his findings are the result of pure speculation or conjecture, an appeal from the decree confirming his order will be sustained.

That a certain obscure disease developed following a traumatic injury is not alone sufficient on which to base a finding that the disease resulted from the trauma without some competent evidence of cause and effect.

On appeal.  Claimant, while in the employ of the respondent, received an injury to the left eye by a nut striking his glasses, breaking them and causing a hemorrhage of the eye.  An agreement for compensation was entered into between the parties and approved by the Labor Commissioner which provided that compensation should be paid at the rate of $18 per week during the period of total incapacity beginning February 4, 1927, and that additional compensation should be paid for any subsequent period of incapacity.  On May 11, 1927, respondent filed a petition to determine the present incapacity and a hearing was had and the petition dismissed and a decree entered that compensation for total incapacity be continued under the agreement, from which decree respondent appealed.  Appeal sustained.

Petition granted.  Case remanded to the Commission to determine the date of termination of incapacity due to the injury.

The case fully appears in the opinion.

Claimant was without counsel.

*Verrill, Hale, Booth & Ives,* for petitioner.

SITTING:  WILSON, C. J., PHILBROOK, DUNN, BARNES, BASSETT, PATTANGALL, JJ.

WILSON, C. J.   One Wallace W. Shaw, on January 28, 1927, while in the course of his employment as a carpenter and engaged in cutting with a cold chisel and hammer small nuts from quarter inch bolts holding the hinges of a vestibule door of a street car, was struck near the eye by one of the nuts as it flew off, breaking his glasses and causing some of the pieces of the glass to enter the eye.

The only injury apparent to the physician who saw him within an hour of the accident was what he termed a sub-conjunctival hemmorrhage due to a slight injury to the tissues and blood vessels of the eyeball beneath the outer covering or membrane.  Owing to the nature of the injury, he was sent on the following morning to a specialist in diseases and treatment of the eye who saw no other external signs of injury.   Nor was his attention called to any during all the time of his treatment from January 29th to February 23rd, although the wife of the patient testified that there was a black place on the nose, meaning, we presume, what is ordinarily termed black and blue, a condition usually following a blow causing an injury to the blood vessels beneath the skin.   Both she and her husband also testified that on the day following the accident there was some bloody mucous discharged from the nose.

The patient returned to work on January 31st and worked two or three days and then complained to the eye specialist that he was subject to headaches, dizziness, and double vision.   As he also displayed symptoms of drowsiness, immobility of expression and lack of memory, the physician having had considerable experience with cases of encephalitis of the lethargic type, or sleeping sickness, advised him to have a physical examination to determine the cause of these symptoms.   No infection developed in the eye and in due time, and long

before the hearing on the petition in this case, it went through the usual process of a complete recovery.

On February 10th, he consulted a general practitioner recommended by the eye specialist and on February 23rd his condition not improving, the physician made a thorough physical examination in the presence of four other specialists in certain branches of medicine. The diagnosis arrived at was "encephalitis and probably encephalitis lethargica."

So far as any inference could be drawn by a layman from the evidence in the record that is not pure conjecture, the injured employee is or was suffering from some form of this somewhat obscure disease caused by the entering into the blood stream and finally the brain cells, in some manner, of a germ about which little is known to medical science and which has not yet been isolated.

Following the injury to the eye and the consequent incapacity, an agreement between the employee and employer was entered into for compensation during disability. On May 11th, 1927, the employer filed a petition to determine his present capacity, alleging that "the incapacity for which the employee is being compensated is ended."

After a hearing at which the employee and his wife and the several physicians who attended or who had examined him testified, the deputy commissioner, without finding as a fact that the pathological conditions described by the physicians as existing was due to the disease known as encephalitis lethargica, and apparently conscious of the lack of evidence sufficient to warrant a positive finding as to any connection between the condition of the employee as diagnosed by the physicians and the slight injury he received, expressed his conclusions as follows: "We think all will agree that the man is suffering from some nerve disorder affecting the brain whatever the name of the disorder may be." This was folllowed by a discussion not based on any testimony in the record, of the olfactory nerves, the boney construction of the nose and its relation to the brain cavity and a theory which is purely speculative as to how the germs may have entered the blood stream and brain in this case. His final conclusion rises no higher than a belief, and has no support on any competent testimony in the case: "We believe the accident caused some sort of an injury to these nerves that the brain became affected. It

seems to us directly connected, even if there be argument as to the name of the disease. We oftimes hear of blows to the 'base of the brain' causing incapacity. This cribriform plate forms a part of the base of the cranium. The trauma was close up to it." There is no testimony in the record of any blow at the "base of the cranium" or any testimony as to the nature or location of any cribriform plate. The only evidence of a blow other than to the glasses is testimony of the wife of a place on the nose indicating a blow, but not of sufficient force even to break the outer skin.

And then by a process of *post hoc, ergo propter hoc* reasoning: "Employee was a well man to the moment of injury. Now he suffers." Therefore he concludes the present incapacity is due to the injury. While this Court must accept his findings of fact, if based on any competent evidence, it is not bound by his reasoning. *Mailman's case*, 118 Me., 177; *Kelley's case*, 123 Me., 261.

From the decree of the Court affirming the decree of the deputy commissioner the petitioner employer appealed. We think the appeal must be sustained.

It is true the present case is based on a petition by the employer, and if the petition had been dismissed upon the ground that an agreement having been entered into, and the status of incapacity being already found to have been caused by the accident, it being presumed to continue until the employer sustains the burden of showing that it has ended or diminished, *Orff's case*, 122 Me., 114, and that it was not sustained, no erroneous ruling of law would have been apparent, as the question of the weight of evidence and whether the burden of proof is sustained is solely for the commissioner. The rule on appeal, however, that slight evidence, if competent, is sufficient to sustain a decree is not the rule for determining whether the burden of proof is sustained before the Commission.

But the deputy commissioner in the case at bar assigned as grounds for his decree conclusions that are unsupported by any competent testimony, or beliefs that are the result of pure speculation and conjecture, which assigned as grounds for dismissing a petition constitute an error in law where they go to essential facts on which the petition is based.

It is undisputed that, at the date of the hearing on the petition, any incapacity due to the injury to the eye had long since terminated.

The issue upon the petition, therefore, was whether the pathological conditions, to which the present incapacity of the employee is due, in any degree resulted from the injuries received from the nut. So far as there is any competent evidence in the case on which to base a positive finding as to the cause of his present incapacity, it is due to the presence of the germ of encephalitis lethargica or the results of infection therefrom. To assign any other cause, so far as the record discloses, is pure speculation, as is apparent from the language of the deputy commissioner, who evidently appreciating the force of the petitioner's contention that from the evidence a conclusion that the disease of encephalitis lethargica could have resulted from the accident was unwarranted, expressed the belief that, while it might be doubtful as to what the nature of the disease was, the accident caused "some sort" of an injury to the nerves that affected the brain.

The only competent evidence in the case connecting the blow from the nut with the introduction of the sleeping sickness virus is the opinion of the physician who made the physical examination that it was "possible" from the history of the case furnished him if there was some lesion of the inner membrane of the nasal passage caused by the blow from the nut through which the germs may have entered, though even he would not say this was probable. He based his opinion upon a statement he found in some medical compendium stating "that the writer has observed a number of instances where trauma immediately antedated the onset of the symptoms of encephalitis" though this writer did not state any connection between a trauma and the disease had ever been proven; and also upon the physician's understanding that the symptoms in the instant case indicated a continuity following the accident in the natural progress of the disease, assuming the period of incubation of the sleeping sickness germ to be from three to six days. He frankly admitted, however, that he did not know and had been unable to ascertain the period of incubation of this germ.

His inference, however, based upon his assumed period of incubation, as to the appearance of the symptoms being consistent with the entering of the germ through any lesion in the nasal passages due to the accident was clearly founded on a false premise. Not that the physician was in any way to blame. He did not see the patient for two weeks after the injury and had to take the history of the case

as given him; but instead of the appearance of the first symptoms of sleeping sickness, namely: severe headaches and dizziness, appearing in due course of three to six days following the accident, as he had inferred from the history of the case given him at the time of the examination, and indicating the entrance of the germs after the injury, these symptoms appeared almost immediately following the accident. The undisputed testimony of the record is that the injured employee came home with a severe headache the very night of the accident and dizziness appeared the following day. This evidence was not before the commissioner at the time the physician expressed his opinion, and there is no evidence that it was called to his attention. If the time of the appearance of these symptoms has any significance as to when the germs entered his system, the only reasonable inference is that it was several days before the accident, and had no connection with it. All the medical testimony is to the effect that the sources of this infection are not yet determined,—in other words, are still the subject of speculation.

The deputy commissioner fell into the same error in his decree,— "that the symptoms began to appear at the proper time AFTER the accident for this disease to have begun at the same time." The stress laid on the word "after" is his. He not only relies on the suggested continuity in the progress of the disease following the accident, but apparently gives weight also to the statement in the loose leaf encyclopedia referred to by the physician as well as another authority named by himself which was in no way referred to in evidence or made a part of the case. Not only are medical books incompetent as evidence of any statement they contain, *Greenleaf on Ev.* Vol. I, sec. 440 note; *Jones on Ev.*, sec. 578; 10 R. C. L. p. 1163; *Ashworth* v. *Kittridge,* 12 Cush., 193; *Washburn* v. *Cuddihy,* 8 Gray, 430, but a decree based in part on any oral statements of material facts or contained in a treatise, outside of the record, is sufficient to sustain an appeal. *Mailman's Case, supra; Gauthier's Case,* 120 Me., 73.

Neither does either of these authorities, if they were competent as evidence, state to what form of encephalitis they refer; whether to encephalitis of the lethargic type or to some other form of brain trouble described under the general head of encephalitis.

Vol 126—38

The testimony clearly discloses that any connection between the pathological conditions described by the physicians and any injury received from the accident described is based on pure speculation and conjecture. Only one of the physicians was willing to say it was even possible. While the others, after a study of the authorities, unequivocally stated that in their opinion there could be no connection.

So far as we are advised, no Court has yet held that knowledge of the sources of the infection known to the medical profession as encephalitis lethargica was sufficiently positive to warrant a conclusion that its inception could be traced to any traumatic injury or was one of the hazards of an employment, *Dehn* v. *Kitchen* (N. D.) 209 N. W., 364; *Donovan* v. *Alliance Elec. Co.* 186 N. Y. S. 813.

While all diseases must have an inception, because a sufferer had some minor accident on the same day on which the symptoms of a particular disease first appeared does not alone lift out of the realm of speculation any causative relation between the two, especially in a case where all medical experience discloses that the sources of the particular infection involved have not been determined and so far as known are always other than traumatic.

When the deputy commissioner apparently abandoned the diagnosis of the medical experts and evolved a theory of his own of an injury to the nerves, olfactory or otherwise, and affecting the brain, based on a blow at the "base of the cranium" of which there is no supporting evidence in the record and by an elimination of all other sources of infection, because none is positively proven, notwithstanding the physicians all agreed that the sources of this particular infection are unknown; and then merely by a *post hoc* process of reasoning assigns the present incapacity to the injury from the blow of this nut, that did not even cause an abrasion in the outer skin of the face or a mark that any examining physician noticed, he wandered still farther into the realms of speculation and conjecture where this Court can not follow.

> *Appeal sustained. Petition granted. Case remanded to the Commission to determine the date of termination of the incapacity due to the injury.*