Barbara MICKELSON, Respondent,

v.

NORTH DAKOTA WORKMEN'S COMPEN-
SATION BUREAU, Appellant.

No. 7727.

Supreme Court of North Dakota.

March 31, 1958.

Leslie R. Burgum, Atty. Gen., P. M. Sand, Asst. Atty. Gen., for appellant.

Strutz, Jansonius & Fleck, Bismarck, for respondent.

SATHRE, Judge.

The plaintiff, Barbara Mickelson, is the surviving widow of Orville Mickelson, deceased, who died October 14, 1952. He had been employed by the Seven Up Bottling Company of Bismarck, from April 1948 to October 7, 1952. His employer the Seven Up Bottling Company was insured under the North Dakota Workmen's Compensation Act, NDRC 1943, 65–0101 et seq. Shortly after his employment he was promoted to plant manager and took charge of the bottling plant and production. On

October 7, 1952, Jack Bay the manager of the Seven Up plant and Mr. Mickelson went to the Cut Rate Drug Store with a pickup truck. At the drug store they picked up a cooler, loaded it on the truck and took it to the Seven Up plant. The cooler which weighed between 300 and 400 lbs. was lifted into the pickup truck by Bay and Mickelson. On the way back from the Cut Rate Drug Store to the Seven Up plant, Mr. Mickelson complained that his back hurt. On the afternoon of that day between 4 and 4:30 o'clock he left the plant and went home because of pain in his back. When he came home that afternoon he went to bed. The pain in his back continued and about 8 o'clock he and his wife drove to Mandan to see a chiropractor who gave him an adjustment. The adjustment however did not seem to give him any relief. Between 2 and 3 o'clock in the morning of October 8th, Dr. Myron Goughnour was called, and later that day he was taken to the hospital. His attending physician at the hospital was Dr. Cartwright of the Missouri Valley Clinic. His condition gradually became worse and he died on October 14, 1952. His attending physician Dr. Cartwright gave as the cause of death a malady known as Guillain-Barre's disease.

On or about December 9, 1952, the plaintiff Barbara Mickelson, surviving widow of said deceased, made application to the Workmen's Compensation Bureau for compensation on account of the death of her husband Orville Mickelson, and for money to pay for medical and funeral expenses incurred in connection with the injury and death of her said husband. The application recites that the deceased received an injury while in the course of his employment on the 7th day of October 1952 and that such injury resulted in his death on the 14th day of October 1952. The Compensation Bureau rejected the application and plaintiff appealed to the district court of Burleigh County.

The district court reversed the order of the Bureau and entered judgment requiring the bureau to allow the plaintiff's application and to make payments as required by the Workmen's Compensation Act. The Bureau appealed from the judgment and demanded a trial de novo in this court.

The case was tried in the district court upon the record made at the hearing before the Bureau. In the record are the original application of the plaintiff, the certificate and the report of the Seven Up Company, transcript of the testimony taken before the Bureau, report of the attending physician, Dr. John W. Cartwright, the testimony of the witnesses and the report of Dr. Myron Goughnour, and the autopsy report of Dr. L. W. Larson of the Quain and Ramstad Clinic.

The Bureau, appellant, contends that the evidence fails to establish that the disease from which Orville Mickelson died was proximately caused by his employment.

Section 65–0102, NDRC 1943, as amended S.L.1947 and 1949, Subsections 8, 8a, 9, 9a, 9b, and 9c provides:

"8. 'Injury' shall mean only an injury arising in the course of employment * * *. Such term, in addition to an injury by accident, shall include:

"a. Any disease which can be fairly traceable to the employment. * * * The disease must be incidental to the character of the business and not independent of the relation of employer and employee. It need not have been foreseen or expected, but after it is contracted, it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a rational consequence;

\*     \*     \*     \*     \*     \*

"9. 'Fairly traceable to the employment' when used to modify the term 'disease' shall mean only a disease which:

"a. Arises under conditions wherein it is apparent to the rational mind

\* \* \* that there is a direct causal connection between the conditions under which the work is performed and the disease;

"b. Can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment; and

"c. Can be fairly traced to the employment."

The plaintiff Barbara Mickelson testified that during the time that her husband had been in the employ of the Seven Up Company, that is from April 1948 to October 7, 1952, he had lost only two days because of sickness. He lost one day because of a cold, and at another time an ice bag had fallen upon his shoulder spraining some tendons and that he stayed home only one day on that account. She testified further that in April 1952 he applied for and obtained hospital insurance for himself and his family.

Mr. Jack Bay the Manager of the Seven Up Bottling plant where Mickelson was employed testified that he had known Mr. Mickelson since January 1948. That Mr. Mickelson first went to work at the plant in March or April 1948 and after about 3 months was promoted to plant manager and took charge of the bottling plant and production. He further stated that Mr. Mickelson and he lifted the cooler into the pickup truck and moved it to the Seven Up plant and that on the way to the plant he, Mickelson, complained that his back hurt. He stated that he worked with Mr. Mickelson about two or three hours every day; that during the time that Mickelson was employed at the Seven Up plant he had not missed more than two or three days.

At the hearing before the Bureau on March 16, 1954, Dr. Cartwright, the attending physician of the deceased, testified that he knew the decedent, Orville Mickelson, during his lifetime and that he was called to treat him on the 8th day of October 1952, and that on that day he admitted him to St. Alexius Hospital and that on October 14, 1952, he died from a malady known as Guillain-Barre's disease.

Dr. Cartwright testified as follows:

"Q. You were his attending physician when he died? A. Yes.

"Q. In your opinion what was the cause? A. Respiratory infection, arrested as well as *involvment* of his cervical dermatone which caused him to stop breathing.

"Q. Could you tell us the common name of this type of syndrome? A. It is called Guillain-Barre disease.

"Q. Having heard the testimony of Mr. Bay and Mrs. Mickelson and having been Mr. Mickelson's attending physician do you think it probable that the disease which caused Mr. Mickelson's death resulted from or was aggravated by the injury he suffered in moving the cooler on October 7? A. I believe it was. Once again, the fact of the injury or as we call it trauma, is found in each case of this disease that has been described. Recently, I have had two conditions in the last year. One having resulted from an automobile accident and the other the result of lifting ties in the Soo Railroad, both of which are proven cases of the disease. Consequently and also from reading our literature the same injury is in a majority of cases fatal.

"Q. Again, in view of the circumstances, do you feel the disease here is one that could be fairly traced to Mr. Mickelson's employment? A. I think the inference is quite clear that—in comparison with other cases the fact of the injury could lead one to believe that there was a very good possibility it was the aggravating cause of the disease."

In his written report dated November 24, 1952, Dr. Cartwright stated:

"His history dated back approximately one week prior to his initial complaint and his entrance to the hospital at which time he had been lifting cases of seven up and hundred pound bags of sugar at which time he had a sharp pain in the low back area. He also at this time had a mild upper respiratory infection and was seen by me on September 30th, 1952 at which time 200,000 U. of Penicillin were administered. Inasmuch as on October 11th his voluntary breathing apparatus had in a measure been knocked out, it was decided to put him in an iron lung to help him breathe; tracheotomy was done by Dr. W. L. Diven the day following which the patient became comatosed in spite of all resuscitative methods and within the next twenty-four hours he passed away.

"Laboratory findings were consistent with a Guillain Barre's disease and a pneumonia bilateral diagnosis was made prior to death. Autopsy findings corroborate the clinical findings as a result of which this is believed, as it has been in the past, according to the best neurologists, to be associated with prior injury to the back and it is felt that this man represents a compensable claim to the North Dakota Workmen's Compensation Bureau."

By stipulation of the parties the hearing was continued on January 21, 1955, for the purpose of taking the testimony of Dr. L. W. Larson who had performed an autopsy on the body of Orville Mickelson. He stated that in performing the autopsy the brain was removed with as much of the cervical cord as possible and placed in a fixative for further examination. He found that the cervical cord showed scattered areas of degeneration in both the gray and white matter of the cord. He was then asked: "By 'scattered areas of degeneration' would that in any way contribute to the cause of death? A. Yes, I would say they did. I think we can explain the whole picture here if we discuss the findings of the lower cord, or at least the spinal cord below the cervical region."

"Q. Do so Doctor. A. The plate over the cord from the vertebra was removed and the dura or meninges was exposed. That was opened exposing the spinal cord. At a point between the 8th and 12th dorsal segments, that is the part of the cord in the lower portion of the thoracic area, chest area. The cord in the segments between the 8th and 12th dorsal vertebra showed a marked softening of the cord. It was almost like mush and the softening extended into the rootlets of these spinal nerves that come off from the cord at this point. This was particularly noticeable over the 11th and 12th vertebra on both sides. Grossly, I thought that there was pus present but we made smears of the cord material and we found no pus cells, so it was not suppurative, or it wasn't the type of inflammation or degeneration which find, for instance in a gangrenous appendix, in which the whole structure is gangrenous. I removed the entire cord and that was preserved in a formalin fixative and sections were made for miscroscopic examination. Now, on miscroscopic examination I found an advance degree of degeneration of the cord, particularly between the 8th and 12th dorsal vertebra segments. Elsewhere in the cord there were spotty or scattered areas of degeneration in both the gray and white material of the cord. There was evidence of inflammation in the nerve-spinal nerve, that **goes out** from the cord.

"Q. This advanced degree of degeneration between the 8th and 12th dorsal segments would you say, Doctor, in your medical opinion that these spots

or advanced degree of degeneration were the result of any lifting he had done previously, say approximately two weeks previous to this examination? A. I could find no evidence of fracture of the spine and the pictures were, both from the gross and microscopic standpoint, is that of an acute form of inflammation with degeneration. Now, I know of no type of injury that could cause a picture such as this. The areas of degeneration are not confined to one segment of the cord, although they are more pronounced between the 8th and 12th segments; however, the same type of degenerative process can be found in other parts of the cord and to a mild extent in the brain itself. So in answer to your question I just can't conceive of a single injury causing a picture such as this."

Doctor Larson was then asked whether "the lifting on October 7, did not or could not bring about the condition referred to of the 8th and 12th dorsal segments and also the scattered degenerated *symtoms* of the entire cord system?"

"A. I don't believe it could.

"Q. In your opinion, Doctor, what was the ultimate cause of death? A. Well, this patient died of a combination of degenerative type of spinal cord and what we call a terminal bronchial pneumonia."

It will be noted that when Dr. Cartwright was asked directly whether the disease from which Mickelson died could fairly be traced to his employment he stated: "I think the inference is quite clear that in comparison with other cases the fact of the injury could lead one to believe that there was a very good possibility it was the aggravating cause of the disease." In his written report of the history of the case Dr. Cartwright stated that on September 30th, seven days prior to the alleged injury from lifting the cooler, Mickelson consulted him and complained of a sharp pain in the low back area, at which time 200,000 U. of Penicillin were administered.

The testimony of Dr. Cartwright was not specific as to whether the disease from which Mickelson died had any connection with or was caused or aggravated by his employment. He concluded that there was a "very good possibility" that the disease was caused or aggravated by his employment. On the other hand Dr. Larson who performed the autopsy testified that there was an advanced degree of degeneration of the spinal cord, but he could find no evidence of fracture of the cord. He found a marked softening and degeneration of the spine so that it was almost like mush. He stated that in his opinion from the examination he had made of the body of Mickelson that the degeneration of the spinal cord could not have been caused by Mickelson's lifting of the cooler.

The two doctors who testified in the case agree generally as to the symptoms of the disease and the cause of death as disclosed by the examination that they had made. We think therefore that the evidence is sufficient to sustain the finding of the Bureau.

In the case of Booke v. Workmen's Compensation Bureau, 70 N.D. 714, 297 N.W. 779, 781, this court said:

"The burden of proof is upon the plaintiff to show she is entitled to share in the fund. Kamrowski v. North Dakota Workmen's Comp. Bureau, 64 N. D. 610, 255 N.W. 101; Dehn v. Kitchen, 54 N.D. 199, 209 N.W. 364. Such proof must amount to something more than mere guess. Such burden has not been sustained 'where the alleged cause is purely speculative and the injury may equally well have been occasioned by factors entirely different from the one advanced as a theory and entirely removed in time from the course of the employment * * *.' Kamrowski v. North Dakota Workmen's Comp. Bureau, supra.

"See also Shamp v. Landy Clark Co., 134 Neb. 73, 277 N.W. 802. Awards cannot be based 'upon possibilities or probabilities, but only upon sufficient

**94**

evidence showing that the claimant'
was injured in the course of the em-
ployment alleged in the claim. Saxton
v. Sinclair Ref. Co., 125 Neb. 468, 250
N.W. 655. 'It is incumbent upon claim-
ant * * * to establish a proximate
and causal connection between injury
received and death.' Slack v. C. L.
Percival Co., 198 Iowa 54, 199 N.W.
323, 326."

See also Feist v. North Dakota Work-
men's Comp. Bureau, N.D., 80 N.W.2d 100.

We conclude that the evidence is
sufficient to support the finding of the Bu-
reau that there was no causal connection
between the employment of the decedent,
Orville Mickelson, and the disease from
which he died. The judgment of the dis-
trict court must therefore be reversed and
the case remanded with directions to rein-
state the order of the Compensation Bureau
denying plaintiff's claim.

GRIMSON, C. J., and JOHNSON,
BURKE and MORRIS, JJ., concur.