Arthur MATTHEWS

v.

**R. T. ALLEN & SONS, INC. and Liberty Mutual Insurance Co.**

Supreme Judicial Court of Maine.

June 8, 1970.

Silsby & Silsby, by Frank B. Walker, Ellsworth, for plaintiff.

Robinson, Richardson & Chapman, by Clement F. Richardson, and Robert L. Hazard, Jr., Portland, for defendants.

Before WILLIAMSON, C. J., and WEBBER, MARDEN, DUFRESNE, WEATHERBEE and POMEROY, JJ.

WEATHERBEE, Justice.

On May 1, 1969 an Industrial Accident Commissioner rendered a decree denying an award of compensation to the Petitioner. Both Petitioner and Employer received the decree on May 13. Petitioner, mistaking his remedy, sought to appeal from this denial by following the procedure provided by M.R.C.P., Rule 80B for review of action by a governmental agency instead of that specifically required in Workmen's Compensation matters by 39 M.R.S.A., sec. 103. He filed a complaint in the office of the Clerk of Courts of Hancock County on June 2, 1969 asking the Superior Court to set aside the Commissioner's decree attaching to the complaint an attested copy of that decree.

The Defendant moved to dismiss the complaint. On September 3 a Justice of the Superior Court entertained the attempted appeal and Defendant's motion to dismiss. He ruled that Petitioner's complaint was in fact a formal presentation of the decree of the Commissioner. He denied Defendant's motion to dismiss the "complaint-appeal" and issued the pro forma decree authorized by section 103. Petitioner immediately appealed from the pro forma decree and Defendant appealed from the Justice's denial of its motion to dismiss the "complaint-appeal". The matter comes to us on both appeals. Petitioner's appeal goes to the merits of his claim for compensation but resolution of the threshold question of the validity of his appeal first demands our attention.

We have on previous occasions examined the singular provisions of our statute concerning decrees of the Industrial Accident Commission. In Middleton's Case, 136 Me. 108, 3 A.2d 434 (1939) we observed that the pro forma decree serves a dual purpose. It is the instrument which gives enforceability to the Commission's decree and it serves the basis for an appeal from the decree. The time periods which determine the validity of an appeal are as provided by the statute. Section 103 reads, in pertinent part:

"Any party in interest may present copies, certified by the clerk of the commission, of any order or decision of the commission or of any commissioner, or of any memorandum of agreement approved by the Commissioner of Labor and Industry, together with all papers in connection therewith, to the clerk of courts for the county in which the accident occurred; or if the accident occurred without the State, to the clerk of courts for the County of Kennebec. Whereupon any Justice of the Superior Court shall render a pro forma decree in accordance therewith and cause all interested parties to be notified. * * *

* * * There shall be no appeal from a decree based upon any order or decision of the commission or of any commissioner unless said order or decision has been certified and presented to the court within 20 days after notice of the filing thereof by the commission or by any commissioner; *and unless appeal has been taken from such pro forma decree within 10 days after such certified order or decision has been so presented.* * * *" (Emphasis added)

The first requirement for appeal is the filing of the Commission's decree in the Superior Court. Petitioner's complaint with the attached copy of the Commissioner's decree was filed in the Clerk's office within the required 20 day period. The Justice construed the complaint to be a formal presentation of the Commissioner's decree satisfying the statutory requirement and his ruling seems to us to be cor-

rect in view of the policy of the law that the Act should receive liberal construction. Simmon's Case, 117 Me. 175, 103 A. 68 (1918). The Petitioner's filing of the Commissioner's decree was timely.

■ The statute then requires a Superior Court Justice to render a pro forma decree in accordance with the Commissioner's decision. There is no time limit within which this must be done in order for it to become the basis for either enforcement of the Commissioner's decree or of an appeal.

As *Middleton* recognized, the schedules of Superior Court Justices may frequently result in extended intervals between appearances of a Justice in some counties. Either party to a proposed appeal is then free to seek out a Justice elsewhere to whom a pro forma decree may be presented for signature if the party considers the delay oppressive.

The initial aspect of the controversy here concerns the statutory provision regarding the appeal from the pro forma decree. The Defendant argues that the appeal must be taken within ten days of the time the certified order of the Commissioner was presented to the Clerk of Courts. The language of the statute could certainly be so construed.

This issue was considered by this Court in *Middleton*. There, delay of several weeks occurred between presentation of the certified order of the Commissioner to the Clerk of Courts and the rendering of the pro forma decree. The appeal was taken within ten days of the date of the pro forma decree but several weeks after the presentation of the certified order to the Clerk of Courts. The Court said flatly "[T]he appeal was within ten days".

■ It is evident that the Court, after reviewing the difficulties inherent in requiring the appellant to obtain the rendering of a pro forma decree within a period too brief to coincide with the travels on circuit of a Justice of the Superior Court concluded that the Legislature must have intended that an appellant's appeal is timely if filed within ten days of the pro forma decree.

This interpretation of the statute's language was made in 1939. If the Court incorrectly construed the Legislature's language the Legislature has had many opportunities to make its intention certain by amendment but this has not been done. It is apparent to us from a review of the records of many such appeals that have come before us that the members of the Bar have relied upon the liberal construction given by *Middleton* thirty-one years ago and that most such appeals would not have been within the time limit which Defendant contends the language of the statute requires.

■ We decline to overrule *Middleton*. The appeal was timely.

■ In the usual appeal from a decree of an Industrial Accident Commissioner, the Commissioner's findings of fact are final if they are supported by competent evidence and reasonable inferences which may be drawn therefrom. 39 M.R.S.A. § 99; Starbird v. Livermore Shoe Company, Me., 239 A.2d 170 (1968); Shaw's Case, 126 Me. 572, 140 A. 370 (1928); Houle v. Tondreau Brothers Company, 148 Me. 189, 91 A.2d 481 (1952). This test is the equivalent of the "clearly erroneous" rule stated in M.R.C.P. Rules 52(a) and 53(e) (2) and applied by language of equal effect in civil actions involving appeals from findings of fact both before and after the adoption of the Maine Rules of Civil Procedure. Ray v. Lyford, 153 Me. 408, 140 A.2d 749 (1958); Harriman v. Spaulding, 156 Me. 440, 165 A.2d 47 (1960); Field, McKusick and Wroth, Maine Civil Practice, supra, 52.7, 52.8, 53.4.

However, this case is presented to us in an unusual posture. The Commissioner heard no oral testimony and his decree is

based upon 1) written reports from doctors, 2) hospital discharge summaries and 3) oral testimony of the Petitioner which was taken before another Commissioner. Although this procedure was followed by agreement of the parties, its effect, especially upon the duties of this Court, requires examination.

39 M.R.S.A. § 98 authorizes hearings before a single Commissioner and empowers the Commission to designate the location of the hearing. Section 99 directs the Commissioner to hear such witnesses as are presented and states "or by agreement the claims of both parties as to such facts may be presented by affidavits". This section also authorizes the parties to present their issue to the Commissioner upon an agreed statement of facts. Section 93 provides for the taking and use of depositions under certain circumstances and by recent amendment (P.L.1969, Chap. 386) authorizes the use before the Commission of all forms of discovery available in civil actions in the Superior Court under the Maine Rules of Civil Procedure.

We understand that on occasions, in the interest of time or expense or to accommodate the Commissioner's schedule, the parties agree that one or more witnesses who reside distant from Commissioner A's usual area of operation may be heard by Commissioner B and transcripts of their testimony are furnished Commissioner A in lieu of appearance before him of the witness. There is no statutory provision authorizing the use of this procedure and certainly a party cannot be required, against his wishes, to forego the right to have the tryer of the fact hear all the testimony except under the circumstances stated in section 93. On the other hand, we recognize that there may be instances where the nature of the expected testimony is such that expediency appears to outweigh the value the Commissioner's opportunity to observe the witness and where the parties can properly choose to facilitate disposition of their matter—so long as their choice is freely made—by

permitting some testimony to be obtained by the unusual practice followed here.

This practice—while resulting in a saving of time and expense—has two disadvantages which render its use inappropriate in most cases. First, it may often leave a Commissioner who hears only a fragment of a case ill prepared to exercise the responsibility concerning presentation of all available evidence which we discussed in White v. Monmouth Canning Co., Me., 228 A.2d 795 (1967) and in Pelletier v. Pinette, Me., 259 A.2d 25 (1969). Second, if the matter is appealed, it thrusts upon this Court the duty of finding facts from the printed record which a Commissioner who hears the living witness is usually better able to do.

The familiar rule that findings of fact will not be set aside if they are supported by competent evidence is based upon appreciation of the truth that the fact finder who hears and sees the witnesses, who observes their hesitations, inflections and emphases, is in a more favorable position to judge their credibility than the appellate court which only reads the printed testimony. Flagg v. Davis, 147 Me. 71, 83 A.2d 319 (1951); Young v. Witham, 75 Me. 536 (1884); Field, McKusick and Wroth, Maine Civil Practice, supra 52.8. M.R.C.P. Rule 52(a) expressly recognizes the trial court's advantages in judging the credibility of the witnesses.

However, the reason for the clearly erroneous rule disappears when the Commissioner, too, makes his decision from the printed record. The appellate court is then in an equally good position to find the facts and must do so uninfluenced by the findings of the Commissioner. In re: Will of Edwards, 161 Me. 141, 149, 210 A.2d 17, 21 (1965); Orvis v. Higgins, 180 F.2d 537, 539, 542 (2nd Cir. 1950), cert. denied 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595. We must decide the single issue of whether the Petitioner suffered a personal injury arising out of and in the course of his employment.

The Petitioner, a 43 year old woodsworker, testified that on November 13, 1967 he was employed loading pulpwood onto trucks by hand. He had worked at this since 7:00 A.M. and the lifting evidently involved bending and straightening the back. The sticks were four feet long and from four inches to two feet in diameter. At about 10:30 or 11:00 A.M. he felt pain in his back but he continued to work. During his noon lunch period while he ate his lunch in the truck, the pain became worse. He worked one to one and a half hours after lunch at which time the pain was so great that he reported to his employer that he was unable to continue and went home. During the next four days the back pain continued to increase in severity and he could not go to work. On November 18 he was admitted to the Maine Coast Memorial Hospital in Ellsworth and on December 10 he was transferred to the Maine Medical Center in Portland where a herniated disc was removed. He returned to work the first of May, 1968.

On cross-examination he testified that the pain began that morning gradually and was not associated with any "specific lifting, slipping or tripping". He admitted he had told an insurance company investigator that the pain came on while he was sitting in the truck at noon but he testified that he had noticed the pain while working that morning "* * * [B]ut when I first noticed it why it didn't bother me to lift or anything. It was after when I started to straighten up to pull myself back." At noon it had become worse. He agreed that he told the doctors that the pain came on gradually and "got worse and worse and worse" as he worked. He also said that on previous occasions while doing woods work he had had low back pains but they were never disabling.

The doctors' reports and hospital discharge summaries add only that the Petitioner had been admitted to the Ellsworth hospital suffering such severe pain that he "could hardly move". During the next four days the pain increased in severity and also radiated down into his left leg and foot. After two weeks of conservative treatment his condition had only worsened. A myelogram showed a defect in the L4–5 interspace on the left and surgery disclosed an acutely herniated disc in that area, which was removed.

The doctors' reports expressed no opinion as to the precipitating cause of the injury, whether it may have developed prior to November 13, 1967 or, if so, whether the exertion of November 13 may have aggravated the condition except for one significant comment to be discussed later.

The Commissioner found:

"The evidence, we find, is insufficient to support a finding that Mr. Matthews sustained a personal injury by accident arising out of and in the course of his employment. We cannot conclude from the testimony that the disc condition which disabled him on November 13, 1967, resulted from any single episode, or traumatic incident. The medical history given by Mr. Matthews and his testimony on cross examination, indicate that the symptoms of the underlying disc condition became disabling on November 13, 1967, but that the herniated disc had developed prior to that time—probably gradually. It is our decision that the petition must be dismissed."

Our own findings lead us to an opposite conclusion.

The Petitioner has the burden of proving that he suffered a personal injury by accident arising out of and in the course of his employment. 39 M.R.S.A. § 52.

 The Workmen's Compensation Law represents a relatively recent concept of responsibility without negligence. While the early cases usually concerned accidental injuries where an external force was applied to an external portion of the body, our own Court decided early in the development of our law that the term injury by accident includes incidents where internal

parts of the physical structure break down under external force, including the stress of labor. While this may more dramatically occur as a result of a slip, a fall or a single unusual strained effort, we have found other such internal breakdowns to have resulted from the usual work which the workman was performing in his usual, normal way. In short, we have construed the term "accident" to include not only injuries which are the results of accidents but also injuries which are themselves accidents. 58 Am.Jur., Workmen's Compensation, § 195. In Brown's Case, 123 Me. 424, 123 A. 421 (1924) a fatal heart dilation resulted from the exertion of shovelling snow. In Patrick v. J. B. Ham Co., 119 Me. 510, 111 A. 912 (1921) the Petitioner's husband suffered a cerebral hemorrhage while performing his regular duties of lifting sacks of grain. In Taylor's Case, 127 Me. 207, 142 A. 730 (1928) the Petitioner's husband had been lifting heavy objects in the course of his usual work and a particularly vigorous straining caused a pulmonary embolism.

This position is in agreement with that taken by the great majority of American jurisdictions and follows the rule recognized in England which in many respects furnished the model for our own Act. Brzozowski's Case, 328 Mass. 113, 102 N.E.2d 399 (1951); Kacavisti v. Sprague Electric Co., 102 N.H. 266, 155 A.2d 183 (1959); Bryant Stave & Heading Co. v. White, 227 Ark. 147, 296 S.W.2d 436 (1956); Larson's Workmen's Compensation Law, Vol. 1A, 38.20. In England the Courts soon came to hold that an unexpected, unforeseen or unintended result from usual or customary exertion constitutes an injury by accident even though there is no unexpected or fortuitous cause. Fenton v. Thorley Co., Ltd., A.C. 443 (House of Lords) (1903); Clover, Clayton & Co. v. Hughes, A.C. 242, 3 B.W. C.C. 775 (1910); A Problem in the Drafting of Workmen's Compensation Acts by Francis H. Bohlen, 25 Harvard Law Review, 328 at page 337.

In some of the earlier decisions holding that the breaking down of internal parts might be accidents under the statute, the death or incapacity occurred suddenly as the internal part dramatically gave way. This furnished another similarity to the usual concept of accident occurring when an external force is applied violently to an external part and assisted this Court in arriving at its conclusion that the Legislature intended both situations to be considered industrial accidents.

"If a laborer performing his usual task, in his wonted way, by reason of strain, breaks his wrist, nobody would question the accidental nature of the injury. If instead of the wrist it is an artery that breaks, the occurrence is just as clearly an accident." Brown's Case, supra, 123 Me. at 425, 123 A. at 422.

Certainly the sudden quality of a mishap often makes it more clearly distinguishable from the mere malfunctioning of an organ which develops through natural progression, unrelated to the employment.

This thinking led our Court in early decisions to describe an accidental injury as being "unusual, undesigned, unexpected, sudden" (Brown's Case, supra, where the employee "suddenly became dizzy, faint and short of breath" while shovelling snow). As recently as in Bernier v. Cola-Cola Bottling Plants, Inc., Me., 250 A.2d 820 (1969) in pointing out that the Petitioner need not prove that his back strain resulted from "any unusual slip, fall, etc., in other words, external injury" we quoted Brown's Case to hold that "an internal injury that is itself sudden, unusual, and unexpected is none the less accidental because its external cause is a part of the victim's ordinary work."

This is not to say, however, that the internal accident must have demonstrated itself by a sudden, dramatic effect upon the victim.

In Taylor's Case the victim continued work until noontime when for the first time he complained of pain in his chest. He continued to work, although with difficulty,

that afternoon but his condition worsened and he died some ten days later. It will be noted that this Court then stated the rule to be that

" * * * [I]f the strain were not accidental, it is the unusual, undesigned, unexpected *or* sudden results of the strain, not necessarily the strain itself, which make the accidental injury necessary under the law." (127 Me. page 209, 142 A. page 752) (Emphasis added)

In Hull's Case, 125 Me. 135, 131 A. 391 (1925) the victim performed his heavy labor in the morning, felt ill shortly thereafter, continued doing lighter work for a half hour and then collapsed and was found to have suffered a cerebral hemorrhage from the earlier exertion.

In McDougal's Case, 127 Me. 491, 144 A. 446 (1920) the Petitioner stood for a considerable time on a ladder with his shin pressed againt the next rung above. There was no single particular episode of trauma or pain. That night his leg became swollen and infection and disability followed. The Court said, "The disability followed its causation in a few hours. Sudden does not mean instantaneous." We concur in the statement found in 58 Am.Jur., Workmen's Compensation, supra, § 196:

"While the concept of accident is ordinarily understood as embodying a certain degree of element of suddenness in the occurrence of the event, and is frequently so defined, it is not always required that the occurrence be instantaneous."

In our present case there is a dearth of medical opinion that might assist us regarding the probable onset of the Petitioner's disabling condition. We are not told how soon pain and disability would be expected to follow the herniation of an intervertebral disc. However, as valuable as medical opinion is, it is not always essential, and sound and rational conclusions in Workmen's Compensation matters may

often be drawn from facts proven and inferences to be logically drawn therefrom although lacking the support of expert opinion. Crowley's Case, 130 Me. 1, 153 A. 184 (1931); Swett's Case, 125 Me. 389, 134 A. 200 (1926).

We have reexamined the holding of this Court in McNiff v. Town of Old Orchard Beach, 138 Me. 335, 25 A.2d 493 (1942). There the Petitioner, who was employed in shovelling sand and peat and throwing it up onto a platform, insisted in testimony that his femoral hernia occurred when he shovelled a particular shovelful of heavy sand. There was medical testimony to the effect that it could not have so developed. The Commissioner rejected the Petitioner's testimony and the Court refused to set aside his findings of fact. We do not construe this opinion to be a holding that the Petitioner had to satisfy the Commissioner that the injury was suffered at a particular moment while throwing up a particular shovelful of dirt or to hold that a weakness in the bodily structure which has gradually worsened and which breaks down finally from the stress of usual work may not be termed an injury by accident.

In our present case we must find the facts.

We find no significant dispute in the testimony. It reveals a 43 year old woodsworker who had had low back pains in the past, usually associated with his work, but never to the extent of being disabling. On this occasion the pain began while he was loading sticks of pulpwood, some very heavy. He continued to work several hours while the pain got "worse and worse and worse". After he stopped working the pain continued to increase in severity and to extend in area until relieved by surgery. Surgery disclosed that an extruding mass from the ruptured disc was pressing against the nerve and obviously bowing it outward and upward.

Facts very similar to ours are found in Hauswirth v. Industrial Commission, 92

Ariz. 251, 375 P.2d 733 (1962). The Arizona Court said:

"If an injury did exist before the alleged accident, it did not interfere with his ability to work. Immediately after that date he began to suffer and complain and was so incapacitated that he could not continue working, and had to have an operation to remedy the situation. * * *

It seems, from all the evidence and all the reasonable inferences that may be drawn from it, that no other possible conclusion could be drawn than that either the petitioner sustained a herniated disc at the time alleged or his condition was aggravated at that time. In either case he would have sustained a compensable injury arising out of and in the course of his employment."

We are called upon to decide whether Petitioner's disability, hospitalization and surgery were casually connected with his activities while loading pulpwood that November 13. Whether Petitioner's disc ruptured abruptly the morning of November 13 or whether the defective condition developed gradually during his previous episodes of low back pain is not controlling here. The scanty facts presented to us lead us to the conclusion that in either case the heavy labor of November 13 constituted the critical episode which completely incapacitated the man with increasing and unrelieved crippling pain until surgery removed the ruptured part.

While we do not know the moment when the actual herniation occurred its causal connection with the labor of November 13 seems apparent. In other words the personal injury appears either to have been caused by the exertions of November 13 or aggravated by them. We have repeatedly held that if stress of labor aggravates or accelerates the development of a preexisting infirmity causing an internal breakdown of that part of the structure a personal injury by accident occurs. Hull's Case, supra;

Swett's Case, supra. The point is dramatized by the language of the Court in Lachance's Case, 121 Me. 506 at page 510, 118 A. 370 at page 372 (1922):

"If Lachance, but for the hurt, would not have died at the time at which, and in the way in which, he did die, then, within the meaning of the Workmen's Act, the unfortunate occurrence, though it merely hastened a deep-seated disorder to destiny, must be held to have resulted in an injury causing death."

Although neither the Ellsworth orthopedic surgeon who originally treated Petitioner nor the Portland neuro-surgeon who performed the surgery was called to testify, the orthopedic surgeon (who also assisted in the operation) commented tersely in his written report:

"Unfortunately, after the pain had developed he continued to work until the job was completed."

We infer from this that it was his opinion that Petitioner's exertion in loading the trucks at least contributed to his disability and to his need for surgery.

We find that Petitioner sustained a personal injury by accident arising out of and in the course of his employment on November 13, 1967.

We consider it appropriate to suggest at this time that members of the bar, Commissioners and physicians should give increased attention to the need for more complete statements and explanations by medical experts in Workmen's Compensation cases concerning the disabilities encountered, their origins and the physiological mechanics involved which might demonstrate their relation, if any, to the circumstances of the employment.

Appeal sustained. Case remanded to the Industrial Accident Commission for determination of compensation. Ordered that an allowance of $350.00 to cover fees of counsel to date plus cost of record be paid by the employer to the employee.