R. A. PFEIFFER, Respondent, v. NORTH DAKOTA WORK-
MEN'S COMPENSATION BUREAU, Appellant.

(221 N. W. 894.)

Opinion filed November 10, 1928.

*Scott Cameron,* for appellant.

*A. F. Greffenius* and *Ritchie & Ployhar,* for respondent.

BURR, J. As stated in the brief of the counsel for the appellant:

"This appeal is from a judgment of the district court finding that the plaintiff is entitled to compensation under the Workmen's Compensa-

tion Act being in the employ of an employer who (had) complied with the law relative to the payment of premium at the time of the alleged injury."

It is conceded that the only issue before the court was whether the blindness of the defendant was caused by an injury received during the course of his employment or that his condition at that time was such as was accelerated by the injury and therefore caused his blindness. It is conceded his employer was insured and that the plaintiff received the blow during the course of employment. The Bureau says that the present condition existing is not the result of this blow and that the blow was so slight as to have no appreciable effect.

In the trial of the case in district court counsel for the defendant, after the issues had been stated said:

"I think it is a question whether he is suffering as a result of an injury or disease; if he is suffering from injury there is one or two courses open to the court, either to determine the amount of recovery, or certify it back to the bureau. If he is suffering from an ailment of the brain which was not induced or aggravated by the injury as we claim, there can be no recovery."

It is conceded that after the injury complained of had been received, the plaintiff was examined by several physicians and it was found he was suffering from a glioma and that this glioma caused his blindness. The injury was received on June 28, 1926. Prior to this time, and as early as January of 1926, the vision of the plaintiff had been examined by Dr. Pray of Valley City. It appears that while the defendant was "under an automobile for the purpose of adjusting and repairing the same, the wrench which he was using for the purpose of repairing and adjusting said automobile slipped off from the burr that he was attempting to turn off, fell out of his hand, first striking the frame of the car and then struck the claimant in the left eye." This injury dazed him for some time and in about an hour his employer sent him to one Doctor Spicer. Later the plaintiff went to Owatonna, Minnesota, and consulted Dr. Senn. From there he went to the Mayo Clinic at Rochester, Minnesota where in July 1926 he was examined by Doctors Adson and Benedict, and subsequently Dr. Benedict operated on him. Later in July of 1926 he was examined by one Dr. Smersch.

Dr. Pray is a qualified and experienced physician and surgeon of

over thirty years' practice. He says he has had experience with the growth commonly called glioma, that in January, 1926, he examined the plaintiff for life insurance and during this examination examined his eyes. He found his vision normal. He testified that a glioma was generally believed to be a malignant growth but it might remain dormant for some time; that such malignant growths lying dormant "are often wakened up by an injury;" and that it is possible a blow could influence it by reason of the locality; that with reference to the testimony of Dr. Adson as to the position of the glioma, a blow struck on the left eye could accelerate it, assuming that it was lying dormant; that such an injury to one eye might cause trouble to the other eye. He also said that if prior to the blow the plaintiff had had his vision corrected by glasses it would indicate the glioma was a dormant one; that such tumors may be of rapid or slow growth. He also stated he did not believe it was necessary to have a blow severe enough to fracture the skull before it would increase the activity of a glioma. He admitted the medical profession did not know yet what was the starting point of such tumors, it was difficult to tell just when they begin or what was the cause, the same as other cancerous growths. He admitted the doctors disagree on some of these points and stated that when doctors did disagree the lawyers decide. He said that this blow which the plaintiff received might or might not have caused activity of the glioma.

Dr. Senn showed that he had had a good deal of practice, was more or less familiar with such tumors and said that probably the blow might cause a hemorrhage on what was called the optic sheath. He said that a tumor as outlined might develop under certain conditions between the 28th day of June 1926 and the 21st day of August 1926 so as to impair the sight; that some of them were of slow growth, and some of them rapid; that mechanical irritation might hasten its rapidity and it might be possible for the blow to cause the hastening of the failing of the sight. He also stated that a blow of the kind received would probably aggravate the tumor and make it develop, and that without the blow it was quite possible the tumor might have lain dormant for a great many years. He further said that the total blindness of the plaintiff might have been superinduced by the blow on the eye; and that this was his opinion at that time. He showed that in 1922 or

1923 he treated this plaintiff testing his eyes for glasses, at that time the vision of the left eye was not normal and that in the summer of 1926 he had had a 20 per cent vision in his left eye, which was corrected by glasses. He testified that a hemorrhage in the back part of the eye might take place twelve hours after the blow; that it was quite possible the injury plaintiff received "caused the lack of vision without there being any signs of an injury." He further testified that when he fitted the glasses the sight was fairly good in the left eye and that he would not have expected to have found such a glioma in the plaintiff's brain at that time, otherwise it is not likely that his vision would have been corrected with the glasses. He said that the troubles the plaintiff experienced at that time were taken care of by the lenses given him.

Dr. Smersch said that he examined the plaintiff on July 5, 1926; that he was told the patient had received an injury by being hit with the wrench; that he examined his right eye at that time and the vision was good; that the vision in the left eye was very slight, the patient being able to read with that eye the largest letters on a chart at a distance of about twenty feet. He saw the abrasion on the left of the left eye right over the cheek bone. He saw him when he came back from Rochester. He had advised him to go to Rochester, and he testified that he believed it was possible for the injury the plaintiff received on the 28th day of June to cause a glioma within the length of time it was discovered. He testified that when he examined him after his return from Rochester the vision was practically null in both eyes; that he had examined him as late as May 25, 1927.

Dr. Adson of the Mayo Clinic testified he had been specializing in brain surgery since 1919. He told where the glioma was located and stated that at the time he examined the plaintiff in July of 1926 the pressure on the optic nerve "had produced complete blindness of the left eye and an impairment of the vision of the right eye, producing a loss of vision in the right upper temporal field." He said that the glioma, such as he had discovered could not be caused by a blow received on the head as a direct cause, but it was very difficult to state the period of development "because the time of its first starting is not known;" that it was possible "they might be in existence for some time before discovery was made of their existence." He said "in my

opinion I could scarcely believe that the blow caused the blindness;" that a blow from the wrench sufficient to cause a hemorrhage on the back of the eye would cause marked discoloration on the front of the eyeball provided the blow struck the eyeball proper. All of the doctors agree that the glioma if developed would eventually cause total blindness. This witness testified that in his opinion the blindness was caused by this glioma. He testified that it was quite possible that the blow might increase the size of the tumor as the result of the hemorrhage but it was speculative. A good sized tumor could develop within two months. He admitted that if the plaintiff had been struck as he said on the eyeball and there had been a growth there that growth might remain dormant for some time if the blow had not been struck. He said the question of whether it was a dormant or malignant growth was purely speculative. He admitted that if it were a malignant tumor which caused the blindness it could not be improved by glasses.

Dr. Benedict of the Mayo Clinic was the doctor who performed the operation. He gives the result of his examination in this lucid and illuminating manner:

Q. What condition did you find, doctor?

A. I found the vision of the right eye 6/6, the vision of the left eye reduced to light perception. External examination of the eyes showed the lids lacrimal apparatus, conjunctiva, cornea, iris, pupils and pupilary action to be normal. Opthalmological examination of the left eye showed the nerve head to be small, pale and atrophic. There were no vascular anomalies of the fundus, no hemorrhage nor rupture of the choriod or retina.

As shown by the transcript of testimony, he says that the conclusion which he formed was that the loss of vision was due to pressure upon the optic nerve. He said that where an individual claimed to have been struck on the left eyeball with a blunt instrument, and if the eye so struck had been examined by a physician who found no outward signs of an injury but found a condition of total blindness in the sight of that eye, there might be a connection between the blow and the state of blindness; but if the condition of blindness was due to the optic nerves being atrophic and also to the glioma pressing upon the optic nerves he would not consider the loss of vision in any way the result

of the blow. Though he says he did not mean that "the pressure upon the optic nerve could not have been originally influenced by a blow upon the eye," his opinion was that a blow on the eye had nothing to do with the amount of pressure on the optic nerve by the glioma in this case. His contention was that the only loss of vision which would come from the blow would be vision that he lost on the day of the injury only. He admits that if the loss of vision from time to time be caused by the glioma it would not have been possible to correct that vision by glasses. He said:

"A hemorrhage within the sheath of the optic nerve sufficient to cause temporary blindness might result in partial permanent blindness, or the vision might come back to the condition that was present before the hemorrhage."

His opinion was that the reduction of vision of the left eye was due to atrophy of the left optic nerve and the effect of any blow received in the region of the eye was purely speculative and that a blow of the severity received would not in his opinion hasten or aggravate the growth that was affecting the optic nerves.

Dr. Spicer examined the patient on the 28th day of June 1926, and from that time until the 21st of July of the same year. Previous to that, some ten days before, he had adjusted glasses for him; and when he saw him on June 28, 1926 there was nothing to indicate lack of vision was due to any injury he received on the eyes prior to that visit. But when his attention was called to a report which he had made to the effect that there was a contusion of the left eye at the time he examined him and an eccymosis and swelling visible at that time he stated it meant there was no injury except that the eye appeared to be swollen.

Such in brief is a synopsis of the testimony of the experts on the material facts in the case. It is the claim of the appellant that the cause of the glioma and its effect are speculative, no connection between the blow and the blindness is shown; and that the plaintiff is not entitled to compensation.

As stated by this court in the case of Dehn v. Kitchen, 54 N. D. 199, 210, 209 N. W. 364:

"The fund administered by the compensation bureau is collected from employers of labor, and is to be husbanded by it in the manner

directed by the legislature for the benefit of workmen who receive injury in the course of their employment."

The burden of proving that the blindness suffered by claimant is the result of being struck by the wrench either directly or by acceleration, is upon the claimant himself in order to prove by the preponderance of evidence that the injury was received in the course of the employment. This burden of proof is not sustained by mere surmise or conjecture and a purely speculative case is not within the protection of the statute. Pace v. North Dakota Workmen's Comp. Bureau, 51 N. D. 815, 201 N. W. 348; Dehn v. Kitchen, supra.

The simple question of fact is whether the glioma was accelerated by the blow—putting the case most strongly against the claimant, though there is testimony to the effect that the blow itself might have been the cause of the glioma and that such affection could develop within the time elapsing between the blow and the operation. To recover it is not necessary to show that the claimant was free from disease prior to the blow. The acceleration of a pre-existing disease to the conclusion complained of under any such circumstances is an injury within the compensation act (Laws 1919, chap. 162). Gotchy v. North Dakota Workmen's Comp. Bureau, 49 N. D. 915, 194 N. W. 667; Pace v. North Dakota Workmen's Comp. Bureau, and Dehn v. Kitchen, supra. This is in harmony with the holdings of other jurisdictions as is shown by the case of Walker v. Minnesota Steel Co. 167 Minn. 475, 209 N. W. 635, 636 where the court says: "An actual aggravation of an existing infirmity caused by accident in the course of employment, is compensable, even though the accident would have caused no injury to a normal person."

It cannot be said in this case that the testimony furnished by the plaintiff is purely speculative. It is true some of the experts who testified for the plaintiff stated there was more or less speculation regarding glioma but this speculation deals more with the beginning of the disease. It is evident it could be present before detection. There is speculation as to what causes it, the same as the medical fraternity speculates in regard to the cause of cancer; but there is no speculation as to the fact that a blow could accelerate it, or could convert a dormant glioma into a malignant one. There was difference of opinion as to

whether the blow received was of such force and character as did accelerate an existing glioma, but there is testimony that such blow could and would—in fact there is testimony that such a blow could cause it. Naturally there is a good deal of speculation in regard to some diseases and afflictions—their origin and development. It is not necessary that the testimony adduced be free from all speculation. In the case of Brown v. North Dakota Workmen's Comp. Bureau, 55 N. D. 491, 214 N. W. 622 the physician testifying for the plaintiff stated that the injury she received was due to her work as a telephone operator, partly because he could find no other inducing cause. To this extent it may be said that his opinion was more or less speculative. But he also stated that the injury was the probable and natural result of the work. When the injury complained of is shown to be a natural and probable result of a blow received; when it is shown that the accelerated condition of the glioma could be caused by the blow; that the nature of the ailment is shown to be such that the blow would affect and accelerate it, and when no other cause is shown, it is not speculative to arrive at the decision that the blow converted a dormant glioma into a malignant glioma and thus caused the blindness. In such case the blindness is the proximate result of the injury received, and thus comes within the protection of the statute. It is true there is testimony to the contrary, as to the effect of such a blow; but all the experts agree the glioma caused the blindness; that it could have been dormant for a long period of time; that a blow of sufficient intensity could accelerate it, and that the change of sight previous to the blow must have been caused by something other than the glioma itself.

The case presents a square conflict of testimony on material matters, but accepting the version as presented by the plaintiff there is ample testimony upon which the court could base its decision. This being a case not triable to a jury nor de novo in this court the findings of the trial court are presumed to be correct, unless clearly opposed by the preponderance of the evidence. Gotchy v. North Dakota Workmen's Comp. Bureau, supra; Dehn v. Kitchen, 54 N. D. 199, 210, 209 N. W. 364. We cannot say that the weight of the evidence is against the claimant. The trial court found in his favor, holding that the injury received accelerated the glioma and thus caused his blindness, whereas

without the injury it would have remained dormant for a long period. There is ample evidence to sustain this and so the judgment of the trial court is affirmed.

NUESSLE, Ch. J., and BURKE, CHRISTIANSON, and BIRDZELL, JJ., concur.