ANGELO ROCCAFORTE, APPELLANT, v. STATE FURNITURE COMPANY, APPELLEE.

7 N. W. (2d) 656

FILED JANUARY 22, 1943.   No. 31436.

*Carnazzo & Kazlowsky* and *G. H. Seig,* for appellant.

*Gaines & Shoemaker, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

MESSMORE, J.

This is a compensation case. The plaintiff's petition was dismissed by a judge of the workmen's compensation court. On rehearing granted, the compensation court awarded the plaintiff compensation for the complete loss of vision of his right eye by virtue of an accident occurring while in the course of his employment. On appeal to the district court, plaintiff's action was dismissed. Plaintiff appeals.

The plaintiff, a man 51 years of age, in good health, was employed by defendant as a cabinetmaker and refinisher of furniture and had been so employed for approximately 15 years. His work consisted of uncrating furniture, staining, polishing, or spraying and getting it in condition to be delivered. To do this work a bench was used, the furniture being lifted onto the bench, to enable the workman to work without being required to do too much stooping. At various times pieces of furniture, such as tables, buffets, dressers, refrigerators, some of it heavy, weighing 300 pounds

or more, would be lifted onto the bench, then uncrated, the plaintiff using a hammer for such purpose, and if any scratches or mars or damage appeared on the furniture it would then be sprayed, polished or stained as its condition required. In lifting heavy pieces of furniture the plaintiff would have help; in lifting lighter pieces, such as chairs, he would do it himself. The benches used for this purpose were about four feet long and three feet wide, and occasionally were moved by the workmen to enable them to set a piece of furniture more easily on the bench. The shop comprised a large room, and on the south side, partitioned off, was a small spray room which was not on the floor level with the shop room, being some seven or eight inches higher.

On December 30, 1939, at about 5 o'clock in the evening, the plaintiff, while working alone, was cleaning up the shop, and endeavored to move into the spray room to put away a spray bench, about four and a half feet long, two and a half feet wide, two feet high, and weighing 49 or 50 pounds, which was two feet distant from the door of the spray room. The bench could not be moved in sidewise but would go in lengthwise. Plaintiff testified: "Q. You tried to lift it endwise? A. Endwise. Q. And tried to lift the end that was away from you up? A. Yes. Q. The distance of seven inches, to put it in the spray room? A. Seven or eight inches, yes, sir. Q. And you lifted it the first time, and didn't lift it high enough? A. No, the leg catch on the step. Q. You tried a second time to lift it? A. That's when it happened to the eye. Q. You felt a pain in the eye? A. Yes. Q. Just like a rubber ball hitting it? A. Yes. Q. And then? A. I see clouds. Q. Then it got dark? A. That's right." He stated he had never lifted the bench in this manner before, but had always had help. This statement is contradicted by a witness who worked with the plaintiff, and who testified that he had seen plaintiff move the spray bench in and out of the spray room on many occasions.

Plaintiff put the bench in the spray room. It was about 5 o'clock; he changed his clothes, went across the street,

got into his car, proceeded to drive it home. His eye felt hazy. He could see from it a little. He reached a grocery store at Seventeenth and Nicholas streets where he called his son by telephone to come and drive him home. After eating his evening meal he went to the basement to smoke, and after 15 or 30 minutes everything grew dark; "it felt like a flame across the eye again" and he could not see. He went upstairs and told his wife. Later, when his son arrived home, a doctor was called, who came and treated him and recommended that the eye be massaged at intervals during the night. The next day plaintiff went to the doctor's office, was sent to a hospital and was operated on December 31. He remained in the hospital three days and returned home. He now has permanent total loss of vision in his right eye.

The experts differed as to whether the loss of vision was due to or associated with exertion when lifting the spray bench, or pressure caused thereby, or was caused by the natural development of an advanced disease. On this point, briefly summarized, the evidence by the expert who performed the emergency operation is that the occlusion of the retinal artery was due to an embolism; the arteries had become smaller, due to the thickening of the walls as a result of arteriosclerosis, and that an embolism somehow became dislodged by his exertion in lifting the bench and evidently was deposited in the central retinal artery, which caused the failure of the blood supply. The testimony of Doctor Judd was to the effect that the inferior temporal artery had become occluded when it crossed the vision and that occlusion occurred on account of this fact, the walls of the arteries contracted as a result of the exertion and that the artery failed to open up again because of the loss of elasticity of the wall itself, due to disease; while Doctor Swab was of the opinion that the occlusion of the artery was due to the development of disease, for the reason that the occlusion of the inferior temporal artery, where it crosses a vein, would not cause total blindness; that the central retinal artery was not entirely closed, and the loss of vision

in the right eye, instead of in the left eye, was contrary to the usual situation, and did not occur immediately when the sensation first developed in the eye, but occurred several hours later; that the strain or exertion causing increased blood pressure would tend to inflate and not deflate the arteries; that both eyes were affected by the same disease; that the size and position of the retinal arteries are such that they are little affected by the results of exertion and change in blood pressure.

There is no question but that before and at the time of the injury the plaintiff had a condition of arteriosclerosis. Without repeating the evidence, but to summarize briefly, there is no dispute that the plaintiff, during his period of employment, worked in and about this bench, or one similar thereto, and would move it from place to place as occasion required, to enable him to perform his duties without too much stooping. He daily lifted pieces of furniture onto such a bench, weighing as much as or more than the bench; in lifting some pieces that were larger and of more than usual weight he had assistance. The bench weighed 49 pounds, and when he attempted to lift it it caught, and on the second attempt he tipped it, as shown by the evidence; at that time he felt the sensation in his right eye, as though he had been struck by a rubber ball. He was engaged in cleaning up the shop. There was nothing unusual in moving the spray bench into the spray room; nothing more or less than would be expected of him by his employer, and as one witness testified, he had seen the plaintiff move this bench on several occasions. He did not slip or fall or bump against the bench, but was performing ordinary duties incident to his employment. There is no evidence to show that the exertion or pressure was such as would be connected in any manner with the disease which he had. He might have lost the vision of his right eye without any exertion, or on any occasion, even in his sleep.

Section 48-152, Comp. St. Supp. 1939, reads in part: "(b) The word 'accident' as used in this act shall, unless a different meaning is clearly indicated by the context, be

construed to mean an unexpected or unforeseen event happening suddenly and violently with or without human fault, and producing at the time objective symptoms of an injury."

The question to determine is whether or not the loss of vision of the plaintiff's right eye was due to an accident, within the meaning of said section 48-152, Comp. St. Supp. 1939, or whether the moving of the bench constituted nothing more than an exertion incident to the plaintiff's employment.

The burden of proof, under the Nebraska workmen's compensation law, is on the claimant to show with reasonable certainty that he sustained an injury from an accident which arose out of and in the course of his employment. It cannot be left to surmise or conjecture, or based on probabilities or possibilities, but must be established in the legal way and not by guess or speculation. This principle of law is too well established to require citation of authority.

"Mere exertion which is not greater than that ordinarily incident to employment, but which combines with preexisting disease to produce disability, is not a compensable 'accidental injury.' " *Rose v. City of Fairmont,* 140 Neb. 550, 300 N. W. 574. Proof must be met by substantial evidence leading to the direct conclusion or legitimate legal inference that such fact caused the disability. See *Wayne County v. Lessman,* 136 Neb. 311, 285 N. W. 579; *Gilkeson v. Northern Gas Engineering Co.,* 127 Neb. 124, 254 N. W. 714; *Brown v. City of Omaha,* 141 Neb. 587, 4 N. W. (2d) 564; *Rose v. City of Fairmont, supra.*

We conclude that no award can be supported by the evidence in this case, and the judgment of the trial court is affirmed.

AFFIRMED.

Rose and Eberly, JJ., not participating.