GEORGIA-PACIFIC CORP., SELF-INSURED EMPLOYER v. ELSIE CRAIG ET AL

5-4351                                    420 S. W. 2d 854

Opinion delivered November 27, 1967

*Paul Sullins* and *W. D. Rothwell,* for appellant.

*Switzer & Griffin,* for appellee.

CARLETON HARRIS, Chief Justice. This is a Workmen's Compensation case. Mallie Craig, age 55, an employee of Georgia-Pacific Corporation and its predeces-

sor, was a crew leader of the bridge crew, operating a pile driver on the job, and acting as foreman when the regular foreman was absent. His normal working hours were 7:00 A.M. to 4:30 P.M. On March 31, 1966, he began his work at the usual time, worked throughout the day, and was on his way back to Crossett to make the 4:30 P.M. quitting time, when he was met by the foreman, and requested to go to a forest fire in Drew County, approximately twenty-five miles away. He arrived there between 5:30 and 6:00 P.M., and left after the fire was extinguished to return home. He arrived at his residence sometime before 11:00 P.M., soon thereafter became ill, and was taken to the Crossett Health Center. At 2:40 A.M., on April 1, he was pronounced dead by Dr. W. A. Regnier, a physician of Crossett. The death certificate, signed by the doctor, stated that Craig's death was caused by a massive coronary occlusion, due to arteriosclerosis. Mrs. Elsie Craig, the widow, filed a claim with the Arkansas Workmen's Compensation Commission on behalf of herself and her minor daughter, Vicki. Dr. Regnier testified at a hearing before the referee, and at the conclusion of the hearing, compensation was awarded. Appellant appealed to the full commission, and there offered the deposition of Dr. Drew F. Agar, a Little Rock internist. The commisson affirmed the referee's award, and on appeal to the Circuit Court of Ashley County, the commission was affirmed. From the judgment so entered, appellant brings this appeal.

Fellow workers on the bridge crew testified relative to their normal duties, and also the work required in extinguishing the fire. No one testified that he observed Craig engaging in any particularly strenuous activity. Mrs. Craig testified that her husband had never missed more than one day of work due to sickness for the nineteen years that he had worked for the company. She said, however, that he had gone to Dr. Regnier; that "he was bothered with his heart, and he would get awfully tired, and he said the truck would just about shake him to death, especially when they'd be on those long

hauls down in Louisiana, lots of times way up in Drew County.'' Claimant testified that on March 31, her husband arrived home about 11:00 P.M., dirty and smutty, and went straight to the bathroom to take a bath. When she advised that his supper was ready, he replied that he did not want any supper, that he had already eaten a sandwich and drunk a coke, and that his chest was hurting. She stated that he thought it was probably indigestion caused by the sandwich. Shortly thereafter, he went to bed, but got up within a few minutes, walking back and forth, and she asked if she should call a doctor. He declined, saying that ''maybe it will wear off in a few minutes.'' After a while, Craig remarked that he was ''deathly sick.'' Mrs. Craig testified:

''* * * And I just ran out to the utility room and got a little ole plastic pail we had out there and ran back into the bed; then I ran to the bathroom and got a wash cloth and when I got back to him I started to bathe his face and when I did he just slumped over to the floor. Well, I called Don, my son, he was sleeping or had laid down up in the front bedroom, he hadn't gone to sleep, and I run in there and called him and of course we called Doctor Regnier and called the ambulance and carried him to the hospital but he was dead on arrival. I found out later that he died in the bedroom, that he didn't live to get on the stretcher.''

Dr. Regnier testified that in October of 1964, Craig had complained to him that his heart was bothering him; that Craig's death was due to a massive coronary occlusion due to arteriosclerosis from which Craig had suffered for about five years. He stated that it was his opinion that the work performed by Craig from 7:00 A.M. until his return to Crossett was a contributing cause to his death.

Dr. Agar was furnished with a copy of the transcript of the hearing before the referee, and he said that, from the testimony, he could see no causal relation-

ship between the activity Craig was engaged in and his subsequent demise.

Appellant mentions that there was no evidence that Craig was ill at any time during the day, and that, on leaving his fellow employees to return home after the fire, he stated, "I'll see you boys in the morning." It is pointed out rather vigorously that Dr. Regnier was far from emphatic in his testimony, and that he would only say that the work *may* have contributed to the attack; further, he would not say that the attack started on the job; also he admitted it was possible that Mr. Craig could have died if he had not worked in a week. Appellant emphasizes that Regnier could not pinpoint any particular work that might have contributed to the attack, nor would he absolutely say that the attack was hastened by the number of hours Mr. Craig worked on the day under discussion. The doctor did say, however, that he did not believe he would have the same opinion if Craig had only worked five hours that day.

It is true that Dr. Regnier's testimony is not as positive as that in some other cases that have been before the court, but it does appear that the doctor was being as conscientious as possible in making his answers. It is evident that he held the opinion that the activities of the day, particularly the long hours, hastened the attack. From the cross-examination:

"Q. So you cannot say or not say whether or not the day that he spent was a contributing factor to his death?

A. In my personal opinion I think it did."

Of course, in this type of case, a doctor can hardly be exact in his testimony. In fact, there are many such instances in the medical field. In *U. S. Fidelity and Guaranty Company* v. *Dorman*, 232 Ark. 749, 340 S. W.

2d 266, this court, quoting from an earlier case,[1] said:

" 'Appellant insists that Dr. Monroe's testimony is speculative, since he admitted the possibility that death was due to some other cause. But medicine, like the law is not an exact science. If mathematical certainty were required, a surgeon would act at his peril in advising his patient to undergo an operation. The law does not compel adherence to a standard so precise. The effect of Dr. Monroe's testimony is that in his opinion the most probable cause of death was a pulmonary embolism attributable to the fractured leg.' "

Here, though unable to pinpoint the work, or the exact number of overtime hours that would have contributed to the heart attack, Dr. Regnier, like Dr. Agar, gave his best opinion after acquainting himself with the history and the facts deemed pertinent. Doctors are experts in their field, and as pointed out in *Dorman,* it is for that reason that they are permitted to express an opinion.

The commission took the view of Dr. Regnier, and, when all the facts are considered, we are not willing to say that there was no substantial evidence to support the award.

Affirmed.

---

[1] *American Life Insurance Company* v. *Moore,* 216 Ark. 44, 223 S. W. 2d 1019.