Verdell J. SUEDEL, Plaintiff-Appellant,

v.

NORTH DAKOTA WORKMEN'S COMPEN-
SATION BUREAU, Defend-
ant-Appellee.

Civ. No. 8974.

Supreme Court of North Dakota.

May 20, 1974.

Rehearing Denied June 4, 1974.

Robert A. Alphson, Grand Forks, for plaintiff-appellant.

David L. Evans, Special Asst. Atty. Gen., Bismarck, for defendant-appellee.

ERICKSTAD, Chief Justice.

Verdell J. Suedel, now Johnson, filed an application with the North Dakota Workmen's Compensation Bureau for the payment of benefits in connection with the death of her husband, Robert A. Suedel, in which she alleged that Robert was employed at the time of the injury which caused his death by KTYN, KNOX, Grand Forks, North Dakota; that he received this injury while in the course of employment on the 16th day of November 1971; that said injury consisted of a ruptured aneurysm which resulted from "excessive pressure of work"; that this injury resulted in his death on the 25th day of November 1971.

The employer, KNOX Radio, Inc., filed a report with the Workmen's Compensation Bureau in conjunction with this claim to the effect that Mr. Suedel was employed by it as an announcer; that no accident occurred on the job; that, however, Mr. Suedel complained of headaches while on the job, and that on one day they became so severe that he asked to be relieved and was taken to the hospital by one of the staff.

Apparently it was on the 16th of November 1971 that Mr. Suedel was taken to the hospital, where he remained until he

died on the 25th of November 1971. Subsequent to a hearing on March 7, 1973, the Workmen's Compensation Bureau, on May 7, 1973, issued its findings of fact, conclusions of law, and order denying the claim.

On May 24, 1973, Mrs. Johnson took an appeal from the order of the Workmen's Compensation Bureau, in which she contended that the Bureau erred in determining that the evidence failed to prove a causal relationship between the deceased's occupation and the ruptured aneurysm which resulted in his death.

The district court, on August 9, 1973, affirmed the order of the Workmen's Compensation Bureau, concluding that the Bureau's findings of fact were supported by the evidence and that its conclusions of law were in accordance with the findings and were supported by law. On appeal to this court Mrs. Johnson asserts that the trial court erred in so concluding.

■ In Haggart v. North Dakota Workmen's Compensation Bureau, 171 N. W.2d 104 (N.D.1969), we determined the scope of review in cases such as this. In Syllabus ¶ 2 we said:

> "The trial de novo in the district court on the record made before an administrative agency and in the Supreme Court on an appeal from the district court in an administrative agency proceeding, as it relates to a determination of the facts, is limited to determining whether there is substantial evidence to support the administrative agency's findings of fact." Haggart v. North Dakota Workmen's Compensation Bureau, *supra*, 171 N.W. 2d 104 at 105.

See also Ambroson v. North Dakota Workmen's Compensation Bureau, 210 N.W.2d 85 (N.D.1973), Syllabus ¶ 2.

Because of the importance of the findings and conclusions of the Bureau, we set them forth at this time.

"FINDINGS OF FACT

"I.

"That the deceased began experiencing severe headaches in July or August, 1971, and was hospitalized on November 16, 1971.

"II.

"That the deceased expired on November 25, 1971, and the cause of death was diagnosed as: 'Massive subarchnoid hemorrhage with intracerebral hematoma, right, secondary to ruptured aneurysm anomalous, right posterior communicating artery.'

"III.

"That evidence adduced indicates that a condition such as that experienced by the deceased could be the result of weakness in the vessel finally getting to the point of rupture.

"IV.

"That leaking aneurysms do not heal but get progressively worse.

"V.

"That the aneurysm could have been leaking for some time and could have been the cause of deceased's headaches starting in July.

"VI.

"That the pain from the headaches would tend to cause stress which could raise blood pressure which in turn could cause the eventual fatal rupture.

"VII.

"That the deceased normally worked a 10 hour day with one 18 hour day being

worked on October 14, 1971, at the deceased's own request.

## "VIII.

"That the deceased carried out his normal occupational duties during the time immediately prior to his hospitalization, and testimony indicates that the deceased enjoyed his work, was a better than average employee, and was to be promoted just prior to his death.

## "IX.

"That enjoyable or pleasant experiences do not cause stress.

## "X.

"That the testimony of Doctors Wallace, a psychologist, and Olmstead, an internist, was based on a hypothetical question and their knowledge of medical reports on file in this case, and not on any personal knowledge of the deceased's previous physical health nor his psychological state.

## "XI.

"That the aneurysm itself was an underlying condition and it could have ruptured under any number of circumstances.

"Based upon the above Findings of Fact, the Commissioners of the North Dakota Workmen's Compensation Bureau make the following:

## "CONCLUSIONS OF LAW

### "I.

"That the evidence submitted to the Bureau fails to establish and prove a causal relationship between the deceased's ruptured aneurysm and subsequent death and his occupation.

### "II.

"That the claimant has failed to prove that she is entitled to benefits under the North Dakota Workmen's Compensation Act as the result of the death of Robert A. Suedel on November 25, 1971."

■ To determine whether there is substantial evidence to support the findings, we shall review the evidence submitted to the Bureau.

Mrs. Verdell Johnson, formerly Verdell Suedel, hereinafter referred to as Mrs. Suedel, testified that she and Robert Suedel were married on October 29, 1966, at Petersburg, North Dakota; that prior to Mr. Suedel's employment with KNOX the Suedels lived in Minneapolis; that they moved to her father's farm in May of 1971; that Mr. Suedel's health was fine in March and April of 1971; that prior to their marriage Mr. Suedel had been involved in an automobile accident and that two or three days before they were married he had been hospitalized in "St. Mike's" Hospital; that prior to their marriage Mr. Suedel had surgery on his back; that in May and June of 1971 his health was fine; that while living with her parents at Petersburg Mr. Suedel commuted daily to Grand Forks in connection with his employment as a radio announcer for KNOX and its predecessor; that he commenced work with the radio station on the 1st of June 1971; that he worked extra hours on many days and worked all weekends; that in August she noticed that Mr. Suedel was slowly getting more rundown from working so many hours and driving back and forth; that sometime in September or October the station switched over to tapes and that this required a lot of extra work on Mr. Suedel's part in learning the new process; that in order to be at work on time he had to get up at 5:30 in the morning; that he drove 60-some miles each way; that two weeks before he became sick necessitating his hospitalization he had a terrific headache on his day off, and that on that occasion his headache was so bad

that he couldn't see to drive an automobile; that Mr. Suedel said the work was really hectic; that towards the last when the station acquired the new computer for tapes, Mr. Suedel was always checking and rechecking to make sure it was right; that he became forgetful; that upon arriving home after a twelve-hour day he was exhausted; that he didn't complain about being in radio, because it was his lifetime dream; that he did say that the hours were long; that he would say that maybe after a good night's sleep things would be better; that towards the last he was more nervous than usual, although he didn't seem like the nervous type; that towards the last he was a completely different man.

Mr. Robert Hanson, the vice president, auditor, and accountant for KNOX, testified that he was not associated with Mr. Suedel or the company which employed Mr. Suedel until KNOX purchased the business on September 9, 1971; that the company from which KNOX purchased the station was Valley Broadcasting Company; that KNOX bought the assets of the corporation, not the corporation itself; that Mr. Suedel worked 262 hours during the month of October 1971; that Mr. Suedel was paid overtime after forty hours per week; that Mr. Suedel worked 128¾ hours for KNOX from November 1 through November 16, 1971; that Mr. Suedel worked 187 hours from September 9 through September 30 for KNOX; that during the time that Mr. Suedel was employed with KNOX the company had no program director, but that Mr. Lockhart managed that part of the station and was Mr. Suedel's supervisor.

In response to an inquiry as to what were Mr. Suedel's average work hours per day, Mr. Hanson testified:

"A Any one day? Well, it appears that generally his work schedule was ten hours a day. Now, there were some days—for instance, the September one, one day was a twelve-hour day and three days were six-hour days and one day was a nine-hour day, and in October there was a twelve, a nine and three-quarters and then five ten-hour days, a five-hour day, three more ten-hour days, a six-hour day and an eighteen-hour day, that being the largest one of all the time, and I understand at that time he was asked by one of the other employees to cover for him, which he did. It wasn't at our insistence or anything.

"Q So in other words, he worked two shifts; his own and someone else's?

"A Yes. Then on October 31st, the period ending that date, there is a five-hour day, five ten-hour days, a seven-hour day, four ten-hour days and two seven-hour days, and the last period in November, with the exception of the Saturday shift, they were all ten-hour days.

"Q What was the Saturday?

"A A seven and—seven and three-fourths."

Dr. John Wallace of Grand Forks, North Dakota, whose formal education includes a bachelor's degree from the University of North Dakota, a master's degree from the New School for Social Research, and a doctor's degree in psychology from the University of Vienna, Austria, testified in response to a hypothetical question. The hypothetical question and other questions and the answers of the doctor follow:

"Assume that Robert Suedel, age 36, was employed in the radio broadcasting work and that prior to his employment he had a history of good health without any significant complaints; that during the month of October 1971 he put in 262 hours working time for his employer in the broadcasting field; and that in November of 1971 from a period of November 1st to November 16th, at the time when he entered the hospital on November 16th, he had put in 128 hours;

"Assume further that during this time he showed signs of exhaustion, he showed signs of fatigue through falling asleep while waiting for supper, complaints of stress and irritation and that of being tense; and assume further that he was hospitalized from the period of November 16, 1971 until the date of his death, November 25, 1971; and assume further that he had at this time prior to his death a cerebral aneurism; and assume further that this cerebral aneurism hemorrhaged and the findings on autopsy were a massive subarachnoid hemorrhage with intracerebral hematoma on the right side and a ruptured anomalous aneurism of the right posterior communicating artery.

"Now, based upon those assumed facts, can you give an opinion, based on reasonable probability, whether the conditions that were recited in the hypothetical question relating to his work and hours of work and the effect upon the individual from his hours of work, whether or not those conditions could cause, precipitate or contribute to the rupture of the aneurism?

"A Yes.

"Q And what is your opinion?

"A My opinion is that from the studies I have made and some of the sources I have consulted, that *it is highly likely that these pre-existing psychological conditions precipitated stress which eventually led to the rupturing of the blood vessels in the brain.* [Emphasis added.]

"Q Now, can you give this Commissioner the basis, as you did in your letter, the basis upon which you would form such an opinion?

"A The basis was this: That assuming the history of long hours of work and assuming that this led to exhaustion, furthermore taking into account the coroner's report which stated in part, 'Massive subarachnoid hemorrhage with cerebral hematoma secondary to ruptured anomalous aneurism of the right posterior communicating artery,' that taking these into account, plus the references I looked up in the text by Weiss and English on psychosomatic medicine, that there is a line of reasoning here which is reasonable and leads one to the professional conclusion that it is quite likely that these pre-existing conditions can lead to physical damage, which then eventually leads to death.

"Q Now what were the reasonings that your authorities set forth as to forming such a conclusion or basis?

"A Well, according to their research and experience—I am referring in my letter here particularly to points 3 and 4 that *when you consider that stress arising from frustration and conflict-ridden situations leads to restriction and pulling of the arteries at the base of the brain and the main branches, and, point number 4, to the detention and dilation of the intercranial arteries, that these workings within the brain can then lead to the mechanical failure of the arterial system itself,* and this mechanical failure statistically is correlated with death in approximately twenty-five percent of the cases which Weiss and English have through their studies predicted. [Emphasis added.]

"Q Would your opinion in this case be based on reasonable probabilities?

"A It is my opinion, yes, that it is based on reasonable probabilities. Twenty-five per cent is a very high level of agreement.

"Q What do you mean? What does the twenty-five per cent represent?

"A The total number of deaths which, so far as I understand it, of course, that Weiss and English are referring to from their samples of people whose deaths have been investigated, that the precipitating or pre-existing stress on the emotional basis played a significant role in the outcome.

"Q That emotional stress played a significant role in causing or precipitating their death?

"A Yes."

Cross-examination of Dr. Wallace disclosed that he had not known or examined Mr. Suedel during his lifetime and that his opinion was based on a report from pathologists, Dr. W. A. Wasdahl and Dr. R. Hejela, and a letter from Mr. Alphson, counsel for Mrs. Suedel, which outlined the history of the pre-existing working conditions.

The pertinent paragraph of Mr. Alphson's letter reads:

"I have enclosed a copy of the autopsy report which shows that he died from a ruptured aneurism. The history shows that he was a radio station announcer and that *he had been working all summer long under difficult situations, lack of help, working from 7:00 A.M. to 1:00 in the morning,* that he would be totally exhausted when he came home and was very nervous and restless because of his overwork and the upset conditions at the station, according to the history from his wife." [Emphasis added.]

Although Dr. Wallace testified that everything that makes people unhappy causes stress, he said that that would be an over-simplified view of what causes stress, and that stress is a condition which exists in the body itself. In response to an inquiry as to whether pleasant occurrences could be considered to cause stress, he replied in the negative.

Dr. Edwin Guy Olmstead, an Associate Professor of Medicine at the University of North Dakota and the Associate Director of the Mental Health Center in Grand Forks, testified that in addition to the usual medical training and degrees he had received slightly over two years of training in psychiatry at Battle Creek, Michigan. In response to the same hypothetical question asked of Dr. Wallace, and an additional question phrased by counsel for claimant in this case, Dr. Olmstead gave his view.

"Now, based upon those assumed facts, *will you give us an opinion which would enable you to state with reasonable medical probability whether or not those conditions that I have outlined, such as fatigue, exhaustion, long work hours, strain and stress, could cause or precipitate the rupture of a pre-existing cerebral aneurism?*

"A *Yes; I believe they could.* [Emphasis added.]

"Q And would you give us your medical opinion supporting the basis for your opinion? ·

"A Well, an aneurism of an artery is an outpocketing of the artery and it doesn't always have muscle coats, it is thin, and there are some good physical principles as to why it tends to get bigger and bigger as time goes on, but in many instances when it ruptures, it ruptures because there has been some increase in the blood pressure; it doesn't have to be very much, and things you have outlined such as stress, overwork, fatigue, are things that will cause the blood pressure to fluctuate, and if the circumstances are right, the elevation of the blood pressure will rupture the aneurism, and that would be my feeling as to why it is possible that this was the case, the basis of which you have told me.

"Q And is your opinion, Doctor, based upon reasonable medical probability?

"A Yes; it is based in part on experience. This is not a rare disease. It is the commonest cause of death in people under thirty-five.

"Q Would you explain what is meant by a pre-existing aneurism?

"A Two per cent of all post mortems that are done, regardless of what the

cause of death is, if a pathologist is careful, two out of every hundred will have at least one aneurism in this part of the brain. That doesn't mean that they all blow up, so two out of every hundred people carry this around.

"Q Would you explain in some detail what an aneurism is and just exactly how it is formed.

"A Well, an aneurism such as we are talking about here in the part of the brain called the Circle of Willis, which is the arterial supply of the brain, these aneurisms are congenital, one is born with them, and an aneurism is part of the blood vessel that doesn't have all the coats on, it outpockets, it pouches out like a balloon. It is thin and under certain types of stress, it breaks.

"Q Now, when they refer to what is called intracerebral hematoma, what is that in connection with his ruptured aneurism?

"A Well, when the aneurism ruptured, the blood spread out over the subarachnoid space, but also some of it penetrated into the brain substance proper because there was arterial bleeding under a fairly good head of pressure. Hematoma is really a collection of blood that escaped from the artery and compressed in the brain and it can be thought of somewhat in terms of a tumor because sometimes these are evacuated surgically."

He testified in response to cross-examination that oftentimes before the final rupture the aneurysm will leak blood into the subarachnoid space and that this produces a headache.

Dr. Olmstead said that prior to testifying he had reviewed the autopsy, which included a clinical summary prepared by Dr. John Lambie. The pertinent parts of that letter read:

"Robert Suedel was hospitalized by me at St. Michael's Hospital from November 16th to November 25th, 1971. The patient was a thirty-six-year-old male who was admitted following onset of severe postoccipital and cervical headache while at work the morning of admission.

"He was admitted for evaluation of his headaches and subsequently expired on November 25, 1971.

"Patient was seen and treated by Dr. Suresh Ramnath, Neurosurgeon, during this period of time and it was felt that his headache at that time was due to a ruptured berry aneurism.

"Before all studies could be completed patient suffered another hemorrhage and expired. An autopsy was performed and this showed massive subarachnoid hemorrhage with intracerebral hematoma on the right side. This was secondary to a ruptured anomalous aneurism of the right posterior communicating artery."

In defining stress and its effect upon the human body, Dr. Olmstead said:

" * * * I use the term 'stress' in terms of either psychological or physical stress which works through what we call the sympathetic nervous system and causes an output of a hormone called adrenalin which raises the blood pressure."

In response to a question as to whether the doctor thought that enjoyment of a job would reduce the stress level, he replied:

"I think it would reduce the stress level if he enjoyed it; on the other hand, if he did it too long I suppose you would get yourself overly fatigued."

Mr. Wayne A. "Bob" Lockhart, the operations manager for KNOX and station manager for KYTN–FM, employed Mr. Suedel and apparently supervised him during the entire period of Mr. Suedel's employment for KNOX and its predecessor. He testified that Mr. Suedel was a perfect employee; that in his opinion there isn't much to operating the equipment of a radio station; that the new equipment went

on the air on October 17, 1971, and that it switches back and forth automatically, but that while Mr. Suedel worked for the station, when the commercial breaks came, he had to manually turn on another recorder; that this, in effect, made it easier for Mr. Suedel, because he was in control of the machine, whereas now under the automatic feature the machine is in control.

Mr. Lockhart further testified that there isn't much to operating the equipment; that he was concerned that Mr. Suedel might become bored with the work and for that reason he encouraged him to interview the news director so that he might become a newsman; that the hours of time recorded in the ledger for Mr. Suedel did not include his driving time; that Mr. Suedel received a monthly allowance at one of the gas stations in town, whereby he received gas and oil and repair work for his automobile in conjunction with driving to and from work; that Mr. Suedel informed him that it was tough on him to drive in every day from the farm and that Mr. Lockhart tried through his father-in-law to find a place in Grand Forks for Mr. Suedel and his family to live.

In light of this record, can we say that the Bureau's findings are not supported by the evidence?

Without attempting to characterize the medical opinions of Doctors Wallace and Olmstead, but assuming for the sake of argument that their opinions were to the effect that Mr. Suedel died as a result of a ruptured aneurysm, which rupture was caused by the stress of his work as a radio announcer, we believe that there is sufficient evidence in the record to support the Bureau's finding that the rupture of the aneurysm was not caused by the stress of his work, but was the result of an ordinary disease of life to which the general public is exposed.

In light of the fact that Mr. Suedel's wife and his supervisor, Mr. Lockhart, both testified that he was doing what he always wanted to do and seemingly enjoyed the work, it is just as probable or even perhaps more probable that if stress caused the rupture of his aneurysm, the stress was due to the driving to and from work rather than to his work on the job, or to the normal activities of life, as indicated by the fact that he had one of his most severe headaches on an occasion of a day off from work.

We think in fairness we should state that had the Workmen's Compensation Bureau concluded to the contrary and found that the stress of the employment caused the rupture of the aneurysm the evidence could have supported such a finding also.

In other words, as we have said on other occasions, it is not our function to try the facts in the first instance; it is merely our function to review the facts to determine whether or not the findings are supported by the facts.

In support of the Bureau's findings, we think it should be pointed out that the hypothetical question assumes a fact which is not supported by the facts, and that is that Suedel worked from 7 a.m. to 1 a.m. regularly. It may be that he did this on the occasion when he worked two consecutive shifts, but not otherwise.

This brings us to the language of Section 65-01-02(8), N.D.C.C., which we believe is pertinent.

"65-01-02. Definitions.—Whenever used in this title:

\* \* \* \* \* \*

"8. 'Injury' shall mean only an injury arising in the course of employment including an injury caused by the willful act of a third person directed against an employee because of his employment, but such term shall not include an injury caused by the employee's willful intention to injure himself or to injure another, nor any injury received because of the use of narcotics or intoxicants while

in the course of the employment. Such term, in addition to an injury by accident, shall include:

"a. Any disease which can be fairly traceable to the employment. *Compensation shall not be paid, however, for any condition which existed prior to the happening of a compensable injury nor for any disability chargeable to such condition. Ordinary diseases of life to which the general public outside of the employment is exposed shall not be compensable except where the disease follows as an incident to, and in its inception is caused by a hazard to which an employee is subjected to in the course of his employment. The disease must be incidental to the character of the business and not independent of the relation of employer and employee.* The disease includes impairment and effects from radiation fairly traceable to the employment. It need not have been foreseen or expected, but after it is contracted, it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a rational consequence; * * *" N.D.C.C.

In essence, what the Workmen's Compensation Bureau found was that Mr. Suedel died of an ordinary disease of life, to which the general public outside of employment is exposed, and that neither the rupture nor the aneurysm was incident to or had its inception with his employment.

Before we conclude our opinion, however, we think it proper to discuss herein some of the authorities relied upon by Mrs. Suedel.

Perhaps her most significant reference is to Larson, The Law of Workmen's Compensation. In that work, Larson discusses injuries from usual exertion or exposure. He divides that subject into three categories: Section 38.20 Category 1: Routine Exertion Causing "Breakage"; Section 38.30 Category 2: Routine Exertion Causing Injury From "Generalized Conditions"; and Section 38.40 Category 3: Routine Exposure Causing Freezing or Sunstroke.

In conjunction with Category 1, we read:

"A large majority of jurisdictions now hold that when usual exertion leads to something actually breaking, herniating, or letting go, with an obvious sudden mechanical or structural change in the body, the injury is accidental.

"So we find an overwhelming majority compensating for hernia, even when the exertion was not out of line with the usual demands of the job. Two states, Missouri and North Carolina, continue to insist upon abnormal exertion in hernia cases. Michigan and Pennsylvania, which at one time required unusual exertion in hernia claims, have produced awards in other types of cases which indicate that they would now follow the majority rule as to hernias. Ohio, which also looked for overexertion in hernia cases, has since altered its general statutory formula, and no longer requires evidence of unusual exertion. Nebraska has also amended its statute in a way that has been construed to eliminate the unusual exertion requirement in this general class of cases.

"Similarly, since a so-called 'slipped intervertebral disc' is a herniation or rupture, and thus mechanically comparable to an inguinal hernia, it is not surprising to find that a heavy preponderance of jurisdictions afford compensation for this type of injury without exacting proof of unusual exertion or mishap as a cause. Indiana and Maryland, and apparently Missouri, hold *contra*. North Carolina, here as in the inguinal hernia cases, has produced decisions pointing both ways, with the more recent holdings in each instance rejecting compensability.

"An overwhelming majority of jurisdictions also find adequate accidental quality in the element of 'breakage' present in such injuries as cerebral hemorrhage, ruptured aneurysm, ruptured aorta, broken blood vessel, apoplexy, aortic regurgitation, hemorrhage in eye, and pulmonary hemorrhage." 1A Larson's Workmen's Compensation Law § 38.20, pp. 7–11 through 7–23.

Although we have not reviewed all of the cases referred to in the footnotes to this section, we believe what is said about Nebraska is illustrative of what is taking place in this nation and indicates that there is a trend toward allowing recovery without proof of unusual exertion.

An example may be found in the following quotation from Larson:

"*Nebraska:* Brokaw v. Robinson, 183 Neb. 760, 164 N.W.2d 461 (1969). Claimant suffered a cerebral vascular accident after performing strenuous work. His first symptoms occurred on the job, when he felt dizzy and his right arm and leg felt numb. By the next day he could not stand up or talk very well. The court held that the amendments to § 48–151(2), R.R.S. 1943, which were enacted in 1963, eliminated the requirement of unusual exertion, and the unexpected event which occurred here, happening suddenly and violently and producing objective symptoms at the time of injury constituted an accident. * * *

"The new statutory language reads as follows:

" 'The word accident as used in this act shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforeseen injury happening suddenly or violently, with or without human fault, and producing at the same time objective symptoms of an injury.' Neb.R.R.S.1943, Section 48–151(2), as amended by Laws 1963, c. 287, § 1, p. 862.

"As examples of pre-amendment holdings, see the following:

"Roccaforte v. State Furniture Co., 142 Neb. 768, 7 N.W.2d 656 (1943). Embolism in retinal artery due to lifting bench; usual-exertion test definitely rejected. [Claim denied.]

"Gilkeson v. Northern Gas Engineering Co., 127 Neb. 124, 254 N.W. 714 (1934). Mitral regurgitation of heart due to pushing automobile to prevent its rolling over a bank." [Claim denied.] 1A Larson's Workmen's Compensation Law § 38.20, p. 7–28.

Further in support of her position, Mrs. Suedel refers us to a 1957 decision of the supreme court of Michigan, which she describes as a case representing the modern-day thinking of courts. Sheppard v. Michigan National Bank, 348 Mich. 577, 83 N.W.2d 614 (1957).

In that case, Justice Black, who was one of the justices who concurred, in separate opinion, in the opinion written by Justice Smith, indicated that the case was one arising out of a strain. A brief quotation from his opinion, quoting from the record, follows:

" '* * * the plaintiff leaned over to pick up a tray of cards from a tub file. The tray stuck, and then the plaintiff yanked on it, and when she yanked, the "pains flew all over" her back.' * * *'" Sheppard v. Michigan National Bank, *supra*, 83 N.W.2d 614 at 627.

Much of the discussion in the separate opinions written by Justices Smith, Black, Edwards, Dethmers, and Kelly, affirming the award, centered around the significance of 1943 amendments to the Michigan workmen's compensation law, wherein most references to the word "accidental" were removed from the law.

In summary, the majority opinions seem to hold that thereafter Workmen's Compensation claims should not be found to be

non-compensable merely because they were non-accidental.

There is one statement in *Sheppard* which is pertinent to the instant case, and that is contained in Justice Smith's opinion:

"The determination of causation rests with the commission. We are not a super-compensation commission any more than we are a super-racing commission. Hazel Park Racing Ass'n, Inc. v. Racing Commissioner, 343 Mich. 1, dissent, 10, 71 N.W.2d 692. We urge our return to our exercise of an appellate function." Sheppard v. Michigan National Bank, *supra*, 83 N.W.2d 614 at 621.

In North Dakota, as in Michigan, our function as an appellate court is not to determine the facts in the first instance, but merely to review the findings of the Bureau in light of the evidence submitted to the Bureau, to determine whether there is substantial evidence to support the findings of the Bureau.

The trial court in reviewing the findings of the Bureau on appeal to it relied in part on Sandlie v. Workmen's Compensation Bureau, 70 N.D. 449, 295 N.W. 497 (1941).

In *Sandlie* a claim was filed with the Bureau by an auditor employed by the North Dakota Mill and Elevator Association, wherein the auditor asserted that in the course of his employment he suffered a stroke of paralysis which totally disabled and incapacitated him. He asserted that in auditing and checking inventories of flour it was necessary for him to do heavy lifting and moving of heavy sacks of flour and that this heavy lifting caused overexertion, producing a rupture of a blood vessel, resulting in a stroke.

The claim was denied by the Bureau, but upon appeal to the trial court the plaintiff's claim was allowed.

In *Sandlie* the plaintiff had suffered from high blood pressure, or hypertension,

for over ten years. In reversing the trial court and in affirming the Workmen's Compensation Bureau, the court said:

"While it appears to be the generally accepted rule that the acceleration of a pre-existing condition may be considered in certain cases to be the proximate cause of the injury sustained, we can not overlook the fact that every exertion has its effect upon the physical system; and if we carry the theory to extremes, then every movement in the course of employment would accelerate the natural condition of the physical body toward disease and decay and death. There must be more than this to justify a holding that the exertion or emotional disturbance was the proximate cause in this case.

"We have examined the evidence carefully and have considered it in the light of the medical testimony. We are clear that the stroke was not the result of the employment, but rather of the condition which existed prior to the employment, and was not aggravated by the employment so as to cause additional injury." Sandlie v. North Dakota Workmen's Compensation Bureau, *supra*, 295 N.W. 497 at 499, 500, *rehearing denied* 1941. [Emphasis added.]

In essence, in this emphasized material this court was saying that there must be proof of unusual exertion for a claimant to recover for aggravation of a pre-existing condition such as this.

The evidence in *Sandlie* was to the effect that the plaintiff in connection with his work was required to lift sacks of flour of various weights from 24 pounds to 98 pounds, and that in many instances he was required to raise these sacks above his head in order to pile them; that on the date he received the stroke he had engaged in an altercation with a representative of the mill and elevator of Duluth, Minnesota, in connection with the conduct of business; that this altercation caused him to become unduly excited and resulted in a stroke.

In light of those circumstances, which under the decisions of some States would seem to justify an award, both the Bureau and the supreme court of this State concluded that the claimant was not entitled to recover. See also McKinnon v. North Dakota Workmen's Compensation Bureau, 71 N.D. 228, 299 N.W. 856 (1941); Pace v. North Dakota Workmen's Compensation Bureau, 51 N.D. 815, 201 N.W. 348 (1924).

Since the Bureau found that the rupture in the instant case was an aggravation of the pre-existing aneurysm and was not brought on by the stress of the employment, usual or unusual, and we have concluded that those findings are supported by the evidence, we leave for another day the determination of the survival of the unusual-exertion test.

For the reasons stated in this opinion, the judgment of the trial court is affirmed.

KNUDSON, PAULSON and TEIGEN, JJ., concur.

VOGEL, Judge (dissenting).

I regret that I must dissent. I simply do not find any substantial evidence to support the decision, and I believe, therefore, that the law requires a reversal.

I would add a little to the facts stated. The distance from Petersburg, where the decedent and his wife lived, to Grand Forks is about 45 miles, so the decedent drove about 90 miles a day to and from work. The two hours or so consumed by the driving were in addition to the long hours worked, as set out in the majority opinion.

The only medical evidence was offered by the claimant. The Bureau offered nothing, except by cross-examination.

Both of the expert witnesses were highly qualified, one in psychology and the other in psychosomatic medicine.

Both of them testified on the basis of hypothetical questions to which no objection was made. The questions were based entirely upon facts testified to by the widow of the decedent, time records of the employer, and the autopsy records and medical records received without objection. Dr. Wallace, the psychologist, testified that in his opinion, based upon reasonable probability, "it is highly likely that these pre-existing psychological conditions precipitated stress which eventually led to the rupturing of the blood vessels in the brain," and,

"The basis was this: That assuming the history of long hours of work and assuming that this led to exhaustion, furthermore taking into account the coroner's report which stated in part, 'Massive subarachnoid hemorrhage with cerebral hemotoma secondary to ruptured anomalous aneurism of the right posterior communicating artery,' that taking these into account, plus the references I looked up in the text by Weiss and English on psychosomatic medicine, that there is a line of reasoning here which is reasonable and leads one to the professional conclusion that it is quite likely that these pre-existing conditions can lead to physical damage, which then eventually leads to death."

Incidentally, the letter from claimant's counsel containing the inaccurate statement as to the decedent's working hours (italicized in the majority opinion) was not referred to in the hypothetical question to Dr. Wallace, nor in his answer. The letter was later brought up in cross-examination by the attorney for the Bureau after queries about the documents which had been furnished to Dr. Wallace.

Dr. Olmstead testified that, based upon a reasonable medical probability, a rise in blood pressure can be caused by stress, overwork, or fatigue and can rupture a pre-existing aneurysm such as the decedent had.

We have always held that aggravation or acceleration of a pre-existing condition may be an injury compensable under the

Workmen's Compensation Act. Pfeiffer v. North Dakota Workmen's Compensation Bureau, 57 N.D. 326, 221 N.W. 894 (1928); Pace v. North Dakota Workmen's Compensation Bureau, 51 N.D. 815, 201 N.W. 348 (1924). In *Pfeiffer*, the injury was due to a slight blow which, because of a pre-existing tumor, resulted in plaintiff's blindness, and in *Pace*, the pre-existing condition was high blood pressure and arteriosclerosis which made decedent more vulnerable to "brain hemorrhage, otherwise known as apoplexy," from which he died after working in excessive heat. The latter case is particularly pertinent to the present case, where the pre-existing condition was an aneurysm, which burst after decedent worked long hours over an extended period, and likewise caused death by a hemorrhage in the brain.

Other jurisdictions have allowed awards in cases where long hours contributed to the injury or death. In J. D. Jewell, Inc. v. Peck, 116 Ga.App. 405, 157 S.E.2d 806 (1967), the decedent was overweight and hypertensive and suffered a fatal heart attack partly because of the long hours he worked. The claimant was allowed compensation. And see Bingham v. Workmen's Compensation Appeals Board, 261 Cal.App.2d 842, 68 Cal.Rptr. 410 (1968) [finding for Bureau set aside and action remanded because of error in application of law], and Georgia-Pacific Corp. v. Craig, 243 Ark. 538, 420 S.W.2d 854 (1967).

In the case before us, the only basis for the Bureau's decision that the death was not compensable is that there was testimony that the decedent enjoyed his work, from which the Bureau drew the inference that he was under no strain, and therefore the death could not have been caused by strain or overwork. This is not only an "awfully over-simplified" view, as Dr. Wallace described it; it is also illogical and unreasonable. To illustrate, I would suppose that a professional football player or an astronaut enjoys his work, but no one can say that he is not under stress, either in the common sense of the term or

the medical sense. But if either the football player or the astronaut should drop dead from a burst aneurysm during employment, surely no one could successfully contend that the right to claim compensation for his death would be lost solely because of the fact that he enjoyed his work. Similarly, I know that busy trial lawyers or businessmen can enjoy their work and still have strokes precipitated by the stress of their work, but surely no one could claim that the Workmen's Compensation Bureau would not be compelled to provide coverage for the hospitalization for treatment of the resulting strokes.

Nor do I read Sandlie v. North Dakota Workmen's Compensation Bureau, 70 N.D. 449, 295 N.W. 497 (1941), or any other of our cases, as having adopted the "unusual-exertion test" in this State. *Sandlie* states that the general rule is that acceleration of a pre-existing condition may be considered to be the proximate cause, but observes that this rule should not be carried to ridiculous extremes, and holds that the claimant did not sustain the burden of proof. As I read the decision, it does not adopt the "unusual-exertion test." We should not do so now, or even "leave for another day the determination of the survival of the unusual-exertion test." A rule that never lived cannot "survive." To adopt such a rule would be, I believe, a move backward and against the modern trend and contrary to the rule in the "overwhelming majority of jurisdictions." See quotations from Larson, Workmen's Compensation Law, Section 38.20, in majority opinion.

As the majority opinion points out, a large majority of the States (even including those which otherwise follow the unusual-exertion test) hold that where "usual exertion" leads to a rupture or breaking or herniating, as of an aneurysm, a recovery is allowed. It also points out that the trend is for more States to join this large majority. Why, then, should we go in the opposite direction? The majority opinion seems to be based on the belief that we are bound by language of the *Sandlie* case and

by a duty to sustain the Workmen's Compensation Bureau where there is a factual basis for its findings.

But I believe that the majority misreads the *Sandlie* case, which really holds only that the claimant did not sustain her burden of proof, and I would hold that there is no factual basis for the decision of the Bureau in the present case.

As I see it, this case offers an interesting contrast with Foss v. North Dakota Workmen's Compensation Bureau, 214 N. W.2d 519 (N.D.1974), which we decided only a short time ago. In *Foss*, the plaintiff simply failed to present proof of a causal connection between the employment and the death occurring in the course of employment. We held there that "a compensation award cannot be made on surmise, conjecture, or mere guess" when the medical proof is adverse to the claimant. In the same way, we should hold here that an award cannot be denied on the basis of surmise, conjecture, or mere guess when all the medical evidence is favorable to the claimant.

I would reverse the judgment of the lower court, on the ground that there is no substantial evidence to support it.